James W. CHAMBERS et al., Appellants,

v.

LOCAL UNION NO. 639, affiliated with
the International Brotherhood of
Teamsters, et al.

No. 76–1006.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 13, 1976.

Decided Feb. 23, 1978.

John V. Long, Washington, D. C., for appellant.

Charles P. O'Connor, Washington, D. C., with whom Thomas K. Wotring, Washington, D. C., was on the brief, for appellee Kane Transfer Co.

S. G. Lippman,* Washington, D. C., with whom Thomas J. Hart,* Washington, D. C., was on the brief, for appellee, Local 639 International Brotherhood of Teamsters.

Before TAMM,** MacKINNON and WILKEY, Circuit Judges.

Opinion filed by MacKINNON, Circuit Judge.

Concurring statement filed by WILKEY, Circuit Judge.

MacKINNON, Circuit Judge:

An issue of relatively recent origin is involved in this case: to what extent the requirement of exhaustion of non-judicial avenues to relief shall be followed in the field of labor-management relations. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965), held that an employee must first attempt to pursue the grievance-arbitration mechanism of the collective bargaining contract, if any exists, before a federal court can entertain a section 301, 29 U.S.C. § 185,[1] breach of contract suit. Two years later, in a case involving a claim of unlawful discharge, which the union had refused to take to arbitration, the court held that, on the facts

---

* At the time of oral argument.

** Circuit Judge TAMM did not participate in the decision of this case.

1. 29 U.S.C. § 185(a) (1970) provides:
 (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

of that case, failure to invoke that process could be excused only upon proof that the union breached its duty of fair representation. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Court had previously held that when an arbitration proceeding was followed to its conclusion, the decision of the arbitrator was entitled to a great deal of respect. *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). When an arbitrator's award upheld management's position, the employer could rely on his contractual right to have the arbitration decision become final and binding—unless, once again, the union's representation of the employee was proven faulty. *Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

Chambers, et al., in the present appeal raise the question whether existing law should be carried one step further to the area of processing internal union complaints. Specifically, we are asked to determine to what extent an employee, whose claim that his employer and the union violated the collective bargaining agreement is augmented by a claim of the union's breach of its duty of fair representation, must pursue an internal union complaint procedure. This issue is the expected outgrowth of the *Steelworkers-Maddox-Vaca-Hines* development, which placed new importance upon the suit for breach of a union's duty of fair representation as a prerequisite for suit on a collective bargaining contract. The issue also comes to us against the background of extensive case law development concerning the suit for breach of a union's duty, and with the support of the Landrum-Griffin Act from which we may receive guidance.

## I. FACTUAL SETTING

The issue here is a familiar one: the accommodation of seniority rosters from two separate plants. In March of 1973, plaintiff-appellants, employees of Kane Transfer (hereafter, Kane), were laid off from a Tuxedo, Maryland plant for which Kane furnished trucking services. Kane Transfer had a "contract" account[2] at another company, Grand Union, and appellants sought to bump into the seniority roster at that plant and displace drivers there who had less seniority. When they were denied that right, appellants brought a grievance to have the seniority rosters merged (dovetailed), claiming such right under Article 43, section 9 of the National Master Freight Agreement:

[This section] sets forth the seniority rights of employees of companies with "contract" and "house" accounts:

. . . with respect to such accounts, drivers on those jobs shall remain on the jobs they came to the Company with, or have gained by vacancies, or the increasing of trucks on such jobs after having been duly posted for bid and the *only time Company seniority shall apply is when an older Company employee must be laid off because of lack of work in any Company job. The driver laid off can then "bump" a "House" or "Contract" account job,* provided the length of time before regular seniority shall apply on such accounts as the result of general layoff shall be sixty (60) calendar days. When working conditions improve, permitting the senior driver or drivers to return to their former job, the account driver shall claim and return to his former job, and the "bumped" driver shall return also to his former job or to a position on the extra board according to his seniority.

(App. 30).***

On April 9, 1973, the grievance hearing was held as called for by the collective bargaining agreement. The minutes of that meeting report:

*See* Article 43, § 9 of National Master Freight Agreement above.

---

**2.** The union characterizes the account as a "contract account"; the company position is that it is a "house account"; but it makes no difference which it is for purposes of this appeal. The collective bargaining contract treats both the same insofar as seniority is concerned.

*** Wherever italicized matter appears in quoted material the emphasis has been added unless otherwise indicated.

Employees from Tuxedo seniority list, who are on lay off status should have the right to *bump into* the seniority list at the Kane Grand Union operation . . .
*Union position:* . . . This deep cut into the seniority list at Tuxedo has caused several problems which has prompted the employees to allege contract violations on the part of Kane Transfer.

The specific grievances are as follows:

1. Employees on layoff status at Kane Tuxedo are not permitted to *bump into* Kane Grand Union, which is a contract account, as provided in Article 43, Section 9(a).

*Company position:* . . . Now general Freight Employees who are on lay-off status want to bump in on the house account.

. . . It was decided that the Company would take the position that General Freight drivers could not *bump into* the house account, present it to the panel and abide by the panel's decision.

*Decision:* The panel meeting in executive session, a motion was made, seconded and passed that the claim of the Union is upheld.

Exhibit B, Appendix, Union Brief.

This decision is hereafter referred to as the April 9, 1973 decision. In accordance therewith Kane notified Tuxedo drivers of their right to employment at Grand Union. The plaintiffs were among those so notified; but by September, 1973, it became clear to them, from their work week assignments, that they had not obtained dovetailed seniority. Then on September 12, 1973 (Union Brief p. 11 n. 5) through the union, as required by the collective bargaining agreement, they brought a *second grievance,* complaining that "there is no confusion about the final [bumping] decision" of April 9, 1973 but that they were entitled to back pay for Saturday work and when not called for Monday work. The basis of this claim was that the split-week work violated the specific provisions of Article 60 of the Agreement (App. 37). Thereafter, on or about October 1, 1973, Kane,

"because of constant pressure from both transferred and existing employees unilaterally posted a seniority list . . . in which the Kane Tuxedo employees were dovetailed into the Grand Union seniority list." (Union Brief p. 11). This met with great consternation among the original Grand Union drivers, and the list was removed by Kane.

The grievance over the split-week then proceeded along the course set out in Article 45 of the Maryland-District of Columbia Supplemental Agreement to the National Master Agreement. Detwiler, the business agent for Local 639, then appeared on October 19, 1973 at a hearing on the grievance before the Maryland-District of Columbia Joint Area Committee. Neither Chambers nor any other grievant was present at this hearing. Nor were they notified of the hearing. Nor were they advised of the decision reached by the committee until after February 25, 1974 (the date they started their lawsuit) (App. 109). The union states that a union secretary neglected to send them the notice of the meeting. (Deposition of Detwiler, pp. 39–40, 53). Be that as it may, the hearing could have been postponed until they were notified and were able to be present if they so wished. And this attempted explanation does not constitute an excuse for not advising them of the result of that hearing and that the union had switched its position and had urged a reversal of the prior final decision on seniority which had not even been included in the article 60 grievance—the second grievance. "At the hearing Detwiler *opposed* the position of the grievants" (Union Brief p. 11) and "used the pending grievances [under Article 60] . . . as a means to bring up [the earlier final decision on the first grievance]" (Union Brief n. 14). In its decision, the Committee "deadlocked" and because of this it is contended that "*no prejudice to appellants occurred.*" However, if appellants had been afforded an opportunity to argue their position, appellants might have prevailed—or at least have prevented the Committee from trying to undo a final arbitration decision that was

not before them. All that was needed was to convince one more person. Since the decision had deadlocked the dispute went to the Eastern Conference Joint Area Committee. While this process was pending, plaintiffs on February 25, 1974 commenced this suit in federal district court.

On April 3, 1974, the district court dismissed the complaint for failure to exhaust the then on-going contract remedies. Shortly thereafter, the Eastern Conference Joint Area Committee hearing took place on April 22, 1974, at which plaintiffs, but not their counsel, were permitted to present their views. The union sided with management against dovetailing, and the union and Kane contend that the decision went against plaintiffs, though it was stated in ambiguous language. But however the decision may be interpreted, it terminated the hope of private contract redress, because of the finality provision of Article 45, Section 3(g):

> Where any committee referred to above in this article by majority vote settles a dispute, such decision shall be final and binding on all parties with no further appeal.

There is an exception to that finality provision, however, which provides: "[f]ailure to comply with any final decision withdraws the benefits of Article 45 [the Grievance Machinery article]." Article 45, section 3(f).

The important question in this case is whether the April 9, 1973 decision was a final contractual adjudication of the grievance, so that the April 22, 1974 decision constituted an impermissible attempt to ignore the finality accorded to the April 9, 1973 decision by Article 45, section 3(g). The district judge recognized this possibility, and on September 17, 1974, vacated his earlier dismissal. If the April 9, 1973 decision were final, then exhaustion of grievance machinery on the later complaint was not necessary.

On October 31, 1975, the district judge granted employer Kane's motion for summary judgment without any mention of the internal union exhaustion requirement (App. 194). Kane's motion had not made that argument and instead stressed that the April 9, 1973 grievance decision granted only the right to bump into the *bottom* of the Grand Union seniority list, and that the April 22, 1974 grievance decision by the Eastern Conference Joint Area Committee addressed the dovetail issue for the first time. Presumably, the district court adopted Kane's theory in granting summary judgment.

The union's motion for summary judgment was also granted on the same day (App. 195). In that order, the district judge explicitly relied on *Imel v. Zohn Mfg. Co.*, 481 F.2d 181 (10th Cir. 1973), *cert. denied*, 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974), ruling that: "plaintiffs have failed to exhaust *internal union remedies* available to all union members under the union constitution and by-laws, said exhaustion being a prerequisite to the commencement of any civil action . . . ." against the union or its officers.

In addition to a number of other contentions, appellants contend that such decision failed to give proper recognition to a controlling provision of the International Constitution on "Exhaustion of Remedies" which *excludes* "collective bargaining matters" from grievances that are required to be exhausted by "any member who is aggrieved by any . . . action of the Local Union [etc.]."

## II. THE SUIT AGAINST KANE

Summary judgment was granted to the employer Kane Transfer Company on the basis of the memoranda and the record submitted. Under Rule 52 of the Federal Rules of Civil Procedure, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." The district judge did not have the opportunity to evaluate the demeanor of any witnesses in this case, and his one-sentence order did not give any reasons for his opinion (App. 194). In light of this, plus our own review of the documents and depositions in evidence, we

find that it was clearly erroneous for the trial court to rule in favor of Kane on the ground that there was "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," the FRCP 56 standard. We further find that, but for the employer's possible right to rely on the outcome of the *second grievance* hearing, the employer would be liable for breach of contract in not permitting dovetailed seniority.

 Our decision on the potential liability of the company does not impute any bad faith on its part. From the very start, Kane expressed no serious interest in the seniority merger one way or the other, so long as the matter was resolved amicably with the employees. But labor-management contracts create rights in individual employees, not just labor unions and employers; and those rights can be enforced in courts of law. *Smith v. Evening News Association*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). When the employer relies on the advice and interpretation of a labor union to the detriment of an employee, it does so at its own risk, subject to an apportionment of any liability between itself and the Union.[3] *Vaca v. Sipes*, 386 U.S. 171, 197, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). This liability runs even to instances where the employer has been entirely sustained in a grievance-arbitration hearing. *Hines v. Anchor Motor Freight*, 424 U.S. 554, 570, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

 The April 9, 1973 arbitration decision was reached in full accord with the grievance procedure requirements. As such it was "final and binding on all parties with no further appeal." Article 45, Section 3(g). To whatever extent the decision on the second grievance attempted to reopen the seniority question settled by the April 9, 1973 decision, it was void and was not itself entitled to any final and binding effect because "failure to comply with any final decision withdraws the benefits of Article 45." Article 45, Section 3(f). The position of the appellee-defendants is that the April 9, 1973 decision did not cover dovetailed merging of seniority rights, but only decided that the Tuxedo drivers could be employed (with no carry-over seniority) at Grand Union. Hence, in appellee's view, the question of the type of seniority to be afforded was properly open at the time of the second grievance.

It is critical to note that we are not directly engaged in an interpretation of the contract itself but rather in an interpretation of the decision on the first grievance on seniority. Ordinarily the opinions of the parties to such a decision would be entitled to respect. But the plain fact of the matter is that the company (Kane), by its own admission, had no interest in having the seniority question resolved in one way rather than another,[4] and hence no interest in consistency between grievance arbitrations. Kane's subsequent action in posting a dovetailed seniority list is totally inconsistent with the assertion that it considered the first grievance decision meant Tuxedo employees were to receive lowest seniority at Grand Union, *i.e.*, merely to be *added* at the bottom of the list.

On the union side, there is also every reason to suspect that the April 22, 1974 decision was an attempt to undo the April 9, 1973 result. Although the first grievance was properly processed, the April 9, 1973 result was reached with union representatives *only from the Tuxedo plant*. It was the union's intent (or negligence) that led to an arbitration posture that would favor dovetailed seniority. By contrast, at the final hearing of April 22, 1974 on the appeal of the Article 60 grievance the union position was so opposed to the dovetailed concept that plaintiff-appellants had to present their own case because the union would not.

---

**3.** If this were not so, no union-shop employee could seek reinstatement after being discharged in good faith by an employer who relied on a union's erroneous allegation that the employee had failed to pay dues, since only the company can provide reinstatement.

**4.** *See* Affidavit of Mr. Kondracki, reproduced in Brief of Appellee Kane Transfer Company at 10.

It is this combination of widely divergent perspectives within the union, and a management position apathetic to either outcome, that warrant rejection of the customary deference to the parties' own interpretation of the April 9, 1973 grievance decision. In effect, the parties who were subsequently interpreting the 1973 decision were not the same parties as those who reached it. Furthermore, the April 9, 1973 decision was a final determination.

The wording and logic of the April 9, 1973 decision are sufficiently clear and compelling to overcome any deference to any union or company construction that might still remain. The logic of the situation argues that the Tuxedo employees were seeking dovetailed seniority at Grand Union. If there were enough job openings at Grand Union for all of the laid-off Tuxedo drivers, then petitioning for seniority at the bottom of the Grand Union plant would not give them anything more. If there were not enough job openings to accommodate them all, then only dovetailed seniority could have created more positions. But the most compelling evidence of all comes from the grievance opinion itself. The employees sought, and the company opposed, the right to "bump *into*" the Grand Union operation.

The term "bump," used in this agreement, *supra*, has a very specialized meaning in labor-management relations. That meaning is reinforced here by its use in presenting the issue before the arbitrators as to whether the drivers could "bump *into*" the seniority list at the Kane Grand Union operations. The unmistakable intent of that formulation is that some employees are to take the places previously held by others. Employees who take up positions at the bottom of a seniority list *bump* no one, much less do they "bump *into*" the list. Examples can be drawn from every branch

of labor law; and the phrase "bump into," when used in a work concept as here, will always be found to imply this notion of displacing (bumping) someone who previously held the job or a listing status on a call sheet.[5] One widely used reference defines the term "bumping" as "[*d*]*isplacement* of a junior employee by a senior employee to avoid a layoff of the senior employee" and in another place states that "bumping" arises because "union contracts often permit employees scheduled for layoff to *displace* less senior employees on other jobs."[6]

Additional proof of the meaning of the term "bump," in the context in which it is used in both the Agreement and the arbitration decision, is also clearly evident when one examines the relevant language of section 9. Such analysis destroys any claim that the word "bump" is ambiguous so far as it concerns the present factual situation.

Article 43, section 9 of the National Master Freight Agreement is the starting point. It provides that "[the] only time *Company* seniority shall apply is when an older Company employee must be laid off because of lack of work in any Company job." This sentence clearly indicates that when an older Company employee, as Chambers was, must be laid off because of lack of work in *any "Company job,"* (this clearly describes Chambers' situation at Tuxedo)—the company being Kane—that the driver's "*Company seniority* shall apply." *Article 43, Section 9, supra.* This is as clearly as it can be stated that Chambers' *company* seniority (as against any plant seniority, *i.e.*, Grand Union seniority) shall apply *company* wide.

The actions of all relevant parties to this case also admit as much, because both Kane and the union did initially attempt to apply *company wide seniority.* The only differ-

**5.** Compare the use of the term "bumping" in the following federal court cases just within the last year: *NLRB v. Teamsters Local 315,* 545 F.2d 1173 [1976] 79 Lab.L.Rep. (CCH) ¶ 11,705 (9th Cir. 1976); *Japan Air Lines Co. v. IAM,* 538 F.2d 46, 52 n.6 (2d Cir. 1976); *Patterson v. American Tobacco Co.,* 535 F.2d 257, 270 (4th Cir. 1976); *Gangemi v. General Electric Co.,* 532 F.2d 861, 863 (2d Cir. 1976); *Ostapowicz v.*

*Johnson Bronze Co.,* 369 F.Supp. 522, 527 n.1 (W.D.Penn.1973) (citing *Webster's Seventh New Collegiate Dictionary*: "Bump—to oust, usually by virtue of seniority rights"), *aff'd,* 541 F.2d 394, 396 (3d Cir. 1976).

**6.** [1976] Labor Relations Expediter (CCH) 62,-626.

ences that are claimed to exist lie in the terms, "nature" and "extent" of that Company seniority. Did it or did it not call for dovetailed seniority? Kane and Grand Union now take the position that section 9 is ambiguous so far as "bump" is concerned and that it does not permit a construction that will permit drivers laid off at Tuxedo to "bump *into*" drivers' jobs at Grand Union because it is a "contract account." But section 9 of the agreement specifically provides that "*company seniority* shall apply . . . when an older Company employee must be laid off because of lack of work in *any Company job*" and "*contract*" accounts are specifically covered, *i.e.*, "The driver laid off can then 'bump' a 'House' or '*Contract*' account job, provided the length of time before regular seniority shall apply on such accounts as the result of general layoff shall be sixty (60) calendar days." The terminology of this sentence plainly indicates that employees at a " 'Contract' account" of the employer (Kane) may be "bumped *into*" by "[e]mployees on layoff status." The arbitrators, therefore, were clearly correct in their decision to that effect on the first grievance as rendered on April 9, 1973. The plain language of section 9 left them no other alternative. The arbitrators' decision, in which "the claim of the Union [was] upheld" that "[e]mployees on layoff status at Kane, Tuxedo [may be] permitted to *bump into* Kane Grand Union, which is a contract account, as provided in Article 43, Section 9(a)," effectively disposed of all questions.

And the intent sought to be conveyed by "bump into" in the grievance award, and "bump" and "bumped" in the Agreement, is identical. In the context in which those terms were used they all refer to a *displacement* of some Grand Union drivers who might have less seniority than Company employees who were out of work as a "result of a general layoff." This is evident from the next sentence of section 9 which provides: "When working conditions improve, permitting the senior driver or drivers to return to their former job, the account driver shall claim and return to his former job, and *the 'bumped' driver shall*

*return also to his former job* or to a position on the extra board according to his seniority." Thus, when a "senior driver" (Chambers) can "return to [his] former job" he shall do so, and "*the 'bumped' [Grand Union] driver shall return also to his former job . . .*" The italicized part of the sentence clearly indicates that the *bumping* which is authorized by section 9 is a *bump* that has the effect of displacing any *drivers* with less seniority working at the "contract account" (Grand Union) from their job which they are to reacquire "[w]hen working conditions improve . . . ," at which time "the 'bumped' driver shall *return* to his *former* job . . ." This negates the contention by the appellees that Tuxedo drivers were to go to the bottom of the list and that no *drivers* at Grand Union were to be displaced.

To contend that, or to construe section 9 as though, "bump" were ambiguous and could be interpreted so that *all drivers* at the "bumped" account would retain their jobs and more senior drivers who supposedly by the Agreement were given a right to "bump" them would be entitled to no work at all, unless new work developed or some employee was fired or lost his job, is completely contrary to the intent clearly evident in section 9. Under the interpretation that Kane and the union advocate, no " 'bumped' driver" at Grand Union would ever "*return* to his former job" because he would never lose it. Thus, appellee's contentions are contrary to the scheme of the Agreement. It is easy to assert in general terms that "bump" is an ambiguous term, and it may be when used in some contexts, but as used here and applied to this factual situation it is plainly indicated that it was intended to convey an intent to authorize the actual *displacement* of less senior drivers by more senior drivers who work for the same transfer company whenever a driver is authorized by the contract to "bump" *into* a contract account. A dovetailed seniority list is thus clearly required. Kane was clearly correct in its initial interpretation of the April 9, 1973 decision interpreting the Agreement, when it prepared a

dovetailed seniority list for the jobs at Grand Union.

■ The conclusion therefore becomes compelling that the April 9, 1973 grievance decision meant what it said, that it had a clear basis in the contract for deciding that Tuxedo employees could exercise company seniority and bump *into* Grand Union jobs, and that the union resisted that grievance decision and improperly attempted to use the second grievance as a vehicle for over-turning the earlier decision. It had no right to do this. Both the company, as well as the union, were bound by the decision on the first grievance, and the rights of the employees which were finally adjudicated in that grievance must be respected. Though without malice throughout the pro-ceeding, it was Kane that, in the end, de-nied the plaintiff employees the benefit of their favorable decision on the 1973 griev-ance. Kane had agreed to this decision, and it was Kane who was bound by the collec-tive bargaining contract to honor the 1973 decision as final, *compare Hines v. Anchor Motor Freight, supra*. We accordingly con-clude (1) that the judgment of the district court was clearly erroneous in ordering summary judgment for Kane, (2) that Kane is liable to appellants for not granting them the dovetailed seniority at Grand Union that is clearly called for by the collective bargaining contract, (3) that the judgment should be vacated, and (4) the case remand-ed to the district court to determine the amount of damages as further outlined in the following discussion of the case against the union.

## III. THE COMPLAINT AGAINST THE UNION AND THE OBLIGATION TO EXHAUST UNION REMEDIES

Appellants[7] have alleged in a single cause of action against their employer (Kane) and their union that the defendants are jointly liable to them in damages be-cause the defendants breached the collec-tive bargaining contract in denying appel-lants work to which they were entitled by their company seniority and that the union in substance aided and abetted this injury to them by breaching the statutory duty of fair representation that it owed to appel-lants as members of the union. Ancillary relief against the union is also prayed for in the form of an injunction[8] to restrain the union from continuing to breach its duty of fair representation of its members, from refusing to recognize the finality of the April 9, 1973 grievance decision by continu-ing to refuse enforcement of appellants' contractual seniority rights in their employ-ment, and from conspiring with the employ-er to deny appellants such rights (App. 16).

The district court granted summary judg-ment for the *union* on the ground

that plaintiffs have failed to exhaust in-ternal union remedies available to all un-ion members under the union constitution and by-laws, said exhaustion being a pre-requisite to the commencement of any civil action, *Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); *Imel et al. v. Zohn Manufacturing Co., et al.*, 481 F.2d 181, (10th Cir. 1973), *cert. denied*, 415 U.S. 914, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974).

(App. 195).

The Teamsters' Local By-Laws require members to exhaust internal union com-plaint processes:

No member or officer of this Local Union shall resort to any court or agency out-side this Local Union or the International Union unless and until he has exercised all his rights as a member and all forms of relief and avenues of appeal as provid-ed by the International Constitution or those By-Laws have been exhausted by him, unless otherwise provided by stat-ute.

---

7. Phillip A. Feaster is a party plaintiff but it is uncontradicted that he had no right to transfer to Grand Union. Hence we do not discuss his seniority claim further. However, this does not eliminate from the case the allegations that some of the acts by the union, to which appel-lants object, were motivated by political con-siderations directed at Feaster.

8. Injunctive relief is also requested against Kane (App. 16).

Article XXII, *By-Laws of Teamsters Local No. 639, Washington, D. C.* This requires members to exercise all their rights to relief provided by the "International Constitution." The Teamsters' Constitution specifies what relief may be obtained through an internal union adjudication:

Decision and penalties imposed upon individual members, officers, elected Business Agents . . . or other subordinate bodies found guilty of charges may consist of . . . commands to do or perform, or refrain from doing or performing, specified acts.

Teamsters' Constitution, Article XIX, § 9(a).

The Teamsters' Constitution further provides:

(c). The appeals procedure herein is also available to and must be followed by any member who is aggrieved by any decision, ruling, opinion or action of the Local Union, membership, officers or Executive Board, *excluding collective bargaining matters.*[9]

Teamsters' Constitution, Article XIX, § 12(c).

■ A union has the right to compel its members to follow certain prescribed practices, among which can be the requirement to exhaust available internal complaint processes before litigating against the union. "Each plaintiff, by becoming a member of the Brotherhood, necessarily made himself a party to that obligation [to exhaust internal union remedies] and estab-

lished a contractual relationship with the Union," *Neal v. System Board of Adjustment* (Missouri Pacific Ry.), 348 F.2d 722, 726 (8th Cir. 1965); *see also International Assoc. of Machinists v. Gonzales,* 356 U.S. 617, 618, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958) (union-member relationship is contractual); *Newgent v. Modine Mfg. Co., supra,* 495 F.2d at 927–928. But those requirements, even if voluntarily undertaken, may not include restrictions violative of the purposes of national labor legislation.[10] *Steelworkers Local 3489 v. Usery,* 429 U.S. 305, 97 S.Ct. 611, 50 L.Ed.2d 502 (1977).

■ If a union has a right to insist on exhausting internal procedures, that right should be most absolute where the complaints allege wrongdoing regarding *internal union affairs.* The existence of the requirements of the Landrum-Griffin Act might seem to settle the matter in favor of requiring internal exhaustion at least as often as one would require resort to contractual grievance arbitration.[11] But in actual development, the statutory permission for the internal union exhaustion requirement found in section 101(a)(4) of this Act, 29 U.S.C. § 411(a)(4) (1970), has been subject to several case-law exceptions, culminating with the Supreme Court decision in *NLRB v. Marine Workers* holding that

There cannot be any justification to make the public processes wait until the union member exhausts internal procedures plainly inadequate to deal with *all* phases

---

9. The Union contends that the sole intent of this provision (Article XIX, § 12(c)) was to prevent harassment of union officials and business agents by dissident members who were outvoted and became unhappy with newly negotiated collective bargaining contracts (Union br. p. 25). However, there is no evidence here upon which to base such a limited interpretation. The plain language of the section authorizes an interpretation that would exclude grievances that focus on employees' rights in their employment under a collective bargaining contract, albeit where the activities of union representatives may also be called into question.

10. A similar restriction is that, although a union is empowered to negotiate a contract on

behalf of its members, that contract cannot waive basic organizational rights of the membership. *NLRB v. Magnavox Co. of Tennessee,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974).

11. No labor organization shall limit the right of any member thereof to institute an action in any court . . . *Provided,* That any such member *may* be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) within such organization, before instituting legal or administrative proceedings against such organizations or any officer thereof.

29 U.S.C. § 411(a)(4) (1970).

of the complex problem concerning employer, union, and employee member.[12] 391 U.S. 418, 425, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968).

It has, indeed, been asserted by both courts and commentators that the exceptions that have been read into the rule that a member must exhaust his intra-union remedies before suing his union have "almost entirely swallowed up the rule itself." [13] There is widespread agreement that the application of this rule rests in the equitable discretion of the court.[14] The considerations influencing the determination of when union members will be required to exhaust internal remedies have varied among the courts, but the most common have been: whether the internal union procedure had been made known to the employee,[15] the severity of the union's in-

12. The Union is in error when it argues that ". . . the statute . . . clearly indicates that the discretion in requiring exhaustion of internal union remedies as a prerequisite to suit under the act (absent a showing of futility or inadequacy of remedy) *is that of the Union".* (Union br. p. 32 n. 20). As Justice Douglas remarked in *Marine Workers:*

We conclude that "may be required" is not a grant of authority to unions more firmly to police their members but a statement of policy that the public tribunals whose aid is invoked may in their discretion stay their hands for four months, while the aggrieved person seeks relief within the union. We read it, in other words, as installing in this labor field a regime comparable to that which prevails in other areas of law before the federal courts, which often stay their hands while a litigant seeks administrative relief before the appropriate agency.[8]

[8] See *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; compare *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971. The requirement of exhaustion is a matter within the sound discretion of the courts. See, e. g., *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 16–17, 83 S.Ct. 671, 674–675, 9 L.Ed.2d 547. And see *Leedom v. Kyne,* 358 U.S. 184, 188–189, 79 S.Ct. 180, 183–185, 3 L.Ed.2d 210; *California Comm'n v. United States,* 355 U.S. 534, 539–540, 78 S.Ct. 446, 450, 2 L.Ed.2d 470. Exhaustion is not required when the administrative remedies are inadequate. *Greene v. United States,* 376 U.S. 149, 84 S.Ct. 615, 11 L.Ed.2d 576; *McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622. See generally 3 K. Davis, Administrative Law Treatise, § 20.07 (1958). When the complaint, as in the instant case, raises a matter that is in the public domain and beyond the internal affairs of the union, the union's internal procedures are, as previously explained, plainly inadequate.

391 U.S. at 426, 88 S.Ct. at 1723. The true criteria for requiring the exhaustion of internal union remedies lies within *the sound discretion of the* courts. The relevant legislative history represented by the principal participants in this legislation supports an interpretation that in certain circumstances union members were to be permitted to invoke the authority of the NLRB even before the end of the four-month period provided in the statute.

Yet it plainly appears from those speaking for the Conference Report that a member was to be permitted to complain to the Board even before the end of the four-month period. Congressman Griffin reported:

"[T]he proviso was not intended to limit in any way the right of a union member under the Labor-Management Relations Act of 1947, as amended, to file unfair labor practice charges against a union, or the right of the NLRB to entertain such charges, even though a 4-month period may not have elapsed."

And on the Senate side, Senator Kennedy said that the proviso was not intended "to invalidate the considerable body of State and Federal court decisions of many years standing which require, *or do not require,* the exhaustion of internal remedies prior to court intervention *depending upon the reasonableness of such requirements in terms of the facts and circumstances of a particular case."* (Emphasis added.) Nor, he said, was it intended to prohibit "the National Labor Relations Board . . . from entertaining charges by a member against a labor organization even though 4 months has not elapsed." (Emphasis in original.)

391 U.S. at 427–28, 88 S.Ct. at 1723–1724.

13. *Detroy v. American Guild of Variety Artists,* 286 F.2d 75 (2d Cir.), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); Summer, *The Law of Union Discipline: What the Courts Do in Fact,* 70 Yale L.J. 175, 207 (1960).

14. *See, e. g., Amalgamated Clothing Workers of America Rank and File Committee v. Amalgamated Clothing Workers of America, Philadelphia Joint Board,* 473 F.2d 1303 (3d Cir. 1973); *McCraw v. United Association of Journeymen,* 341 F.2d 705, 711 (6th Cir. 1965), *disapproved on other grounds, International Brotherhood of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971).

15. *See, e. g., Steib v. New Orleans Clerks,* 436 F.2d 1101, 1106 (5th Cir. 1971); *contra, Newgent v. Modine Mfg. Co.,* 495 F.2d 919, 928 (7th Cir. 1974).

fringement on an employee's rights,[16] the egregiousness of the union's action relative to its charter authority,[17] and whether later money damages would afford adequate relief.[18] The underlying test, however, as Justice Douglas stated in quoting from the remarks of Senator John F. Kennedy, is that the exercise of the court's discretion to "require, or . . . not require, the exhaustion of internal union remedies prior to court intervention [depends] *upon the reasonableness of such requirements in terms of the facts and circumstances of a particular case."* (Emphasis added in Court opinion) 391 U.S. at 428, 88 S.Ct. at 1723.

These principles from the Landrum-Griffin Act jurisprudence are instructive for cases like the one at hand, where the charge against the union raises a matter that is in the public domain, *i. e.,* the fairness of the union's representation of its members as required by the Landrum-Griffin Act, and extends beyond the internal affairs of the union in that it involves an alleged breach by the employer and the union of rights conferred on employees by a collective bargaining agreement.[19] A union can require its members to abide by many regulations, but none that conflict with national labor relations policy. *Steelworkers Local 3489 v. Usery, supra.* National labor policy does not relegate an employee to internal union complaint procedures which cannot provide that employee with the relief he seeks,[20] are futile except to delay redress,[21] and run contrary to the decided cases interpreting 29 U.S.C. § 411(a)(4).

If the member becomes exhausted, instead of the remedies, the issues of public policy are never reached and an airing of the grievance never had. The Court of Appeals recognized that this might be the consequence and said that resort to an intra-union remedy would not be required if it "would impose unreasonable delay or hardship upon the complainant." *NLRB v. Marine Workers,* 379 F.2d 702, at 707.

*NLRB v. Industrial Union of Marine and Shipbuilding Workers,* 391 U.S. 418, 425, 88 S.Ct. 1717, 1722, 20 L.Ed.2d 706 (1968).

When appellants filed their lawsuit on February 25, 1974 the record indicates that the union may have already violated its duty of fair representation in various ways: by failing to comply with the final arbitration decision of April 9, 1973; by covertly seeking a reversal of that decision, despite its finality, in *another* grievance proceeding; by conducting an *ex parte* hearing on appellants' second grievances without notification to Chambers or the other grievants and without the presence of any of them; by conspiring with Kane in "opposing [appellants] bumping rights" (App. 14); and by vigorously asserting in the second grievance proceeding that appellants' "bumping" rights at Grand Union were to be construed in a manner contrary to the position the union had taken on the first grievance and contrary to the final decision on that grievance without notification to appellants of the change in the union position, in anything remotely related to reasonable promptness, or of the decision

16. *See, e. g., Libutti v. DiBrizzi,* 337 F.2d 216 (2d Cir. 1964).

17. *See, e. g., Simmons v. Avisco,* 350 F.2d 1012 (4th Cir. 1965).

18. *See, e. g., Detroy v. American Guild,* 286 F.2d 75 (2d Cir. 1961).

19. Some cases have held that the doctrine requiring exhaustion of internal remedies is wholly inapplicable in cases not involving purely internal union problems. *See, e. g., Brady v. Trans World Airlines,* 223 F.Supp. 361 (D.C. Del.1963), *aff'd* 401 F.2d 87 (3d Cir. 1968), *cert. denied,* 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969).

20. *Fredrickson v. System Federation No. 114 of Railway Employment Dept., AFL–CIO,* 436 F.2d 764 (9th Cir. 1970); *Yeager v. C. Schmidt & Sons,* 355 F.Supp. 332 (E.D.Pa.1973); *Cefalo v. UMW,* 311 F.Supp. 946 (D.D.C.1970).

21. *See, Verville v. International Ass'n of Machinists and Aerospace Workers,* 520 F.2d 615, 620 (6th Cir. 1975); *Semancik v. UMW Dist. 5,* 466 F.2d 144, 151 (3d Cir. 1972); *Local Union No. 28, International Brotherhood of Electrical Workers v. International Brotherhood of Electrical Workers,* 197 F.Supp. 99 (D.C.Md.1961).

reached at the *ex parte* hearing on October 16, 1973.

The facts conceded by both parties which support appellants' claim that the union had violated its duty of fair representation (App. 13–14) are much stronger than those relied on in *Hines v. Anchor Motor Freight,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). In *Hines,* such conclusion was reached merely on a showing of a perfunctory presentation without investigation of the grievants' cases before the committee. Whereas here the April 22, 1974 decision by the Eastern Conference Joint Area Committee announced its decision stating ". . . the bumping provisions are in accordance with the seniority clause of the contract, therefore the Union's monetary claim for back pay for F. Mayo and J. Chambers is denied." (Union Brief p. 15, n. 7). This adverse decision to appellants' claims represented the culmination of all the defects in representation of which appellants complain.

What was said in *Brady v. Trans World Airlines, Inc.,* 401 F.2d 87 (3d Cir. 1968) with respect to adjustment boards which were designed to give representation to management *and* the union is even more true with respect to hearing boards that are composed completely of union personnel—

> the union's interest might conflict with the employee's . . . In such circumstances, the union can hardly be expected to press the employee's claim vigorously and forthrightly.

\*　\*　\*　\*　\*　\*

"It is simply repugnant to our standards of fundamental fairness and totally unrealistic to require an employee to submit a dispute he has with his bargaining agent for final determination to persons selected by and representing the bargaining agent."

401 F.2d at 93.

The union-company position antagonistic to appellants has hardened. Appellants are confronted with a settled decision which conforms to the contentions of the Union, and Kane is willing to implement it. That decision, reached on the merits, if not otherwise improper, is final and binding on all parties as provided by the Agreement. Recourse to internal union procedures could not conceivably change that opinion. The seniority-roster-merger question has gone too far, and involves the company too deeply, for the plaintiff-employees to expect any reasonable chance of relief from subsequent internal union complaint proceedings.[22]

As above indicated, the cause of action against Kane and the union relates principally to the denial of appellants' seniority rights in their employment, and focuses on the *employment relation* rather than the union relation, though the alleged improper activity by the union may be an integral part and contributing cause of the damages suffered by appellants. Appellants seek to be assigned work by the employer and to be compensated for past violations of their rights, remedies which internal union proceedings are inadequate to produce. To require appellants to exhaust union remedies would be repugnant to fundamental

**22.** Whether this low likelihood meets the higher standard of "futility," which standard is applied when the union insists on its right to require exhaustion, is not ruled upon here. *Cf. Retana v. Apartment, Motel, Hotel, and Elevator Operators, Union Local No. 14, AFL–CIO,* 453 F.2d 1018 (9th Cir. 1972) (where union and employer have allegedly conspired to defeat plaintiff's rights, internal remedies need not be exhausted). For example, the only provision in the Local's By-Laws affording internal complaint processing appears under the heading, "Charges and Trials" and states that "Members and Officers of this Union may be charged *only* with the offenses specified in the International Constitution, and shall be tried in accordance

with the procedures there specified." Article XXI, § 4, *By-Laws of Teamsters Local 639, Washington, D. C.*

In addition to the above stated reasons for not requiring appellants to exhaust exclusively internal union procedures, there is the point that in large measure, though not completely, the items in dispute relate to "collective bargaining measures" and Article XIX, Section 12(c) does not require aggrieved union members to appeal such claims. To the extent that appellants' claims were based on a breach of contract violation arising from the refusal to comply with the April 9, 1973 final arbitration decision they are "collective bargaining measures" and not "*internal* affairs of the Union."

requirements of fairness. Establishing such exhaustion as a prerequisite to suit is premised on the hope that non-judicial procedure will be able to solve the difficulties involved quickly and with expertise.[23] When, however, union bias and conflict of interest makes any such hope illusory, it would be an abdication of judicial responsibility to remit the plaintiff to the union's procedures.

We hold that the instant facts and circumstances render it unreasonable to insist that appellants exhaust any internal union remedies before suing the union and Kane on the cause of action set forth in their complaint. (App. 8–17). *Cf. NLRB v. Marine Workers,* 391 U.S. at 426, 88 S.Ct. 1717.

It is sufficient that appellants exhausted their contract remedy and that the final decision of the Contract Arbitration Committee in the first grievance supported their contention. We thus conclude that the decision of the trial court was clearly erroneous in granting summary judgment for the union on the ground that appellants had not exhausted their internal union remedies.

We do not, however, suggest that summary reversal in the appellants' favor should be granted, but merely that the judgment in the union's favor should be vacated and the case remanded to the district court for trial on the merits of appellants' claim that the union violated its obligations to appellants as alleged in the complaint. We recognize that the union is in a very difficult position, but the case against it involves a number of genuine issues of fact that, as yet, have not been proved.[24] The alleged participation of the union in violating appellants' rights is a more complex question than the violation by the company. The case against the company is essentially completed by our interpretation of the seniority clause of the agreement and by the admission that Kane denied appellants the dovetailed company seniority at Grand Union that they were entitled to.

The case against the union, however, depends upon proof of a number of additional acts by those acting for the union and in some instances the intent with which those acts were committed. It will also be necessary, if the court finds that the union is jointly liable, to take evidence in order properly to apportion the damages with Kane. In deciding that the appellants need not exhaust their internal union remedies, we do not determine that the union has in fact breached its duty of fair representation to them or illegally interfered with their contractual rights. We hold only that this action should not be barred by appellants' failure to exhaust the union grievance mechanisms, and remand the case so that they may have the full hearing on their claim to which they are entitled.

## IV. THE MOTION TO SUPPLEMENT THE COMPLAINT

Appellants have moved for leave to file a supplemental complaint which is based on certain events involving their subsequent transfer back to Kane at the demand of the Union. These events occurred after the filing of the original complaint, and it is alleged that they constitute a further breach of appellants' rights under the collective bargaining agreement (App. 123–125). This motion has not been acted upon. At first blush it appears to contain allegations that are supplementary to and relevant to the instant complaint. The factual allegations also may be admissible as tending to show a common scheme and plan. On remand the District Court should consider this motion by appellants.

The orders of October 31, 1975 granting summary judgment against plaintiffs and in favor of Kane and Local 639 are vacated and the case is remanded to the district court for further proceedings consistent with this opinion.

*Judgment accordingly.*

---

23. *E. g., Ruzicka v. General Motors,* 523 F.2d 306 (6th Cir. 1975).

24. We note that the union's statement of material facts as to which there is no genuine issue does not make any reference to the second grievance.

WILKEY, Circuit Judge, concurring:

I am pleased to join in Parts I, II and IV of Judge MacKinnon's opinion. In Part III, however, I concur only in the result.