FRATERNAL ORDER OF POLICE MPD LABOR COMMITTEE, Appellant,

v.

PUBLIC EMPLOYEE RELATIONS BOARD, Appellee.

No. 85–485.

District of Columbia Court of Appeals.

Argued March 27, 1986.
Decided Oct. 20, 1986.
As Amended Oct. 28, 1986.

---

31. The trial judge did not rule on appellant's motion for more than one year from the time it was filed.

Robert E. Deso, Washington, D.C., for appellant.

Christopher A. Hart, with whom James H. DeGraffenreidt, Jr., Washington, D.C., was on the brief, for appellee. Peggy A. Miller, Washington, D.C., entered an appearance for appellee.

Before NEBEKER, NEWMAN, and BELSON, Associate Judges.

NEBEKER, Associate Judge:

This case is an appeal by the Fraternal Order of Police/Metropolitan Police Department Labor Committee (Union) of a Superior Court order which affirmed a decision of the Public Employee Relations Board (Board). The Board concluded that the Union had violated the Standards of Conduct for Labor Organizations [1] when it rescinded an earlier decision to pay up to $100 per hour for legal counsel retained by one of its members, James Hairston. On appeal, the Union levels several challenges to the Board's decision, none of which we find persuasive. Accordingly, we affirm.

The relevant facts are as follows.[2] James Hairston is an officer of the Metropolitan Police Department and a Union member. On October 12, 1981, while employed off-duty by the Super Pride Supermarket in Northeast Washington, Hairston became involved in an altercation with Tyrone Boyd. During this altercation, Hairston shot Boyd, who later died as a result.

In January 1983, Hairston was indicted by a Superior Court Grand Jury for volun-

---

1. *See* D.C. Code § 1–618.3(a)(1) (1981).

2. This case originally involved three separate complaints filed with the Board by Officer Hairston. In addition to the standards of conduct allegation, the complaints alleged that the Union and the Metropolitan Police Department had engaged in a number of unfair labor practices.

The Board ultimately dismissed those portions of the complaints that alleged the unfair labor practices. Thus, the only violation found by the Board was the standards of conduct violation by the Union. Our review of the facts is limited to those giving rise to that violation.

tary manslaughter while armed in the shooting death of Tyrone Boyd. To defend against this charge, Hairston requested legal assistance from the Union. The Union had already been providing legal counsel to Hairston since June 1982 to aid in the defense of a wrongful death suit filed by the executrix of Boyd's estate. The Union authorized its retained counsel to represent Hairston in the criminal case as well.

In February 1983, shortly before he was to be arraigned, Hairston dismissed Union counsel from the criminal case and informed the Union that he wished to be represented by counsel of his own choice. On February 16, the Union's Executive Committee voted to give Hairston up to $100 per hour to pay for the attorney of his choice to represent him in the criminal case.

The attorney chosen by Hairston was Geraldine Gennet. Gennet had in the past represented groups which certain Union officials and members deemed to be antagonistic to the interests of the Union. After it was learned that Hairston had retained Gennet, a Union official expressed the view that "we can't have her representing James Hairston because that means she would have too much inside information on us."

Following Hairston's arraignment, Gennet wrote to Gary Hankins, Chairman of the Union Labor Committee, with her financial requirements for the preparation of Hairston's defense. Gennet required $6,000 in advance, $100 per hour for herself, $75 or $85 per hour for an associate, and additional sums for both a paralegal and an investigator. Hankins did not have the authority to bind the Union to such terms absent approval by the Executive Committee. Hence, an emergency meeting of the Committee was held on February 24, 1983.

Following a sometimes heated debate concerning Union finances and the Union's obligation to support its members, the Committee voted not only to reject Gennet's proposed fee schedule, but to rescind as well the agreement to give Hairston $100 per hour to be applied towards the fee for the attorney of his choice. Instead, the Union offered Hairston two options. Either accept the representation of Robert Ades and Associates, who were retained by the Union on a deductible fee basis,[3] or accept the application of the $750 deductible towards another attorney of Hairston's choice. Hairston rejected both of these offers.

The Union subsequently distributed a flyer and published a magazine article attempting to explain their rescission of their prior agreement with Hairston. According to Hairston, neither the flyer nor the magazine article, both of which were widely distributed during the pendency of his court proceedings, accurately reflected all of the facts surrounding his case.

On June 15, 1983, Hairston filed the first of two "Unfair Labor Practice Complaint[s]" with the Board, alleging that the Union and the Metropolitan Police Department had engaged in unfair labor practices within the meaning of D.C. Code § 1–618.-4(a)(2), (b)(1), and (b)(2). On July 22, 1983, Hairston filed a third complaint, alleging that the Union had violated the Standards of Conduct for Labor Organizations within the meaning of id. § 1–618.3(a). The following month, Hairston amended the June 15 complaint to include in it allegations of standards of conduct violations. All of these complaints were consolidated for hearings which were held in September and October of 1983.

Following six days of testimony and the submission of post-hearing briefs, the hearing examiner's report and recommendation was received by the Board on November 25, 1983. The hearing examiner recommended the dismissal of all charges against the Police Department and all of the unfair

---

**3.** The Union would pay Ades a $750 deductible for the defense of a felony prosecution, Ades absorbing the remainder of the cost.

labor practice charges against the Union. However, the examiner concluded that the Union had violated the standards of conduct provision of D.C. Code § 1–618.3. In support of this conclusion, the hearing examiner specifically found that the Union's decision to rescind the original fee arrangement with Hairston was motivated in large measure by Hairston's choice of Gennet as his attorney, and that the flyer and magazine article distributed by the Union were inaccurate in several important respects. As a sanction, the hearing examiner recommended that the Union: (a) be directed to issue a flyer and a magazine article retracting the inaccurate statements contained in the previous flyer and article, (b) distribute a retraction to the same extent as the previous flyer, (c) refund all dues paid by Hairston since the February 24, 1983 meeting of the Executive Council, and (d) post notices stating that in the future the Union will comply with the provisions of D.C. Code § 1–618.3.

The Board agreed with the hearing examiner that all charges against the Police Department and the unfair labor practice complaints against the Union be dismissed. The Board also accepted the hearing examiner's findings of fact with regard to the rescission of the fee arrangement, and agreed as well that a standards of conduct violation had been proved. However, the Board departed from the hearing examiner on the sanction to be imposed. The Board ordered that the Union begin negotiations with Hairston to implement, within reasonable limits, the Union's original fee arrangement of $100 per hour. Neither Hairston nor the Union filed a request for reconsideration of the Board's final decision and order. The Board's final decision and order was affirmed by the Superior Court on March 22, 1985.

The threshold question that we must decide is whether the Board had jurisdiction to review what the Union characterizes as an "internal union matter."

The Standards of Conduct for Labor Organizations is set out at D.C. Code § 1–618.3, which provides in part:

(a) Recognition shall be accorded only to a labor organization that is free from corrupt influences and influences opposed to basic democratic principles. A labor organization must certify to the Board that its operations mandate the following:

(1) The maintenance of democratic provisions for periodic elections to be conducted subject to recognized safeguards and provisions defining and securing the right of individual members to participate in the affairs of the organization, to fair and equal treatment under the governing rules of the organization, and to fair process in disciplinary proceedings[.]

■ By its terms, the statute confers authority upon the Board to require a labor organization, as a prerequisite to recognition, to certify that it will guarantee certain basic rights to its membership. The statute does not give the Board continuing review authority to require a labor organization to maintain such standards following recognition. However, D.C. Code § 1–605.2(9) provides that the Board shall have the power to "[m]ake decisions ... on charges of failure to adopt, subscribe *or comply* with the internal or national labor organization standards of conduct for labor organizations." (Emphasis added.) In addition, § 1–618.3(c) empowers the Board to adopt all appropriate rules and regulations. Those rules provide that:

Any person who is aggrieved because a labor organization has failed to adopt, subscribe, or comply with the Standards of Conduct for Labor Organizations shall communicate this information to the Board for investigation and appropriate action.

27 D.C. Reg. 484 (1980) (adopted 27 D.C. Reg. 1390 (1980)). Thus, the statute and the regulations promulgated by the Board empower the Board to review complaints alleging the failure of a recognized labor

organization to comply with the standards of conduct mandated by § 1–618.3.

The Union contends, however, that the Board was required to dismiss the standards of conduct allegations because of Hairston's failure to exhaust internal union remedies as required by the Union's bylaws.[4]

██ It is true that "[a] union has the right to compel its members to follow certain prescribed practices, among which can be the requirement to exhaust available internal complaint processes before litigating against the union." *Chambers v. Local Union No. 639*, 188 U.S. App. D.C. 133, 142, 578 F.2d 375, 384 (1978). Such requirements will not be enforced, however, if they violate clearly expressed labor policy. *Id.*

The statute and the rules adopted by the Board express a clear intent that alleged violations of the standards of conduct be promptly brought to the Board's attention. The statute directs that "[a]ny complaint of a violation ... *shall* be filed with the Board." D.C. Code § 1–618.3(c) (emphasis added). Similarly, the rules direct that any person aggrieved by the failure of a labor organization to comply with the statute "shall communicate" the violation to the Board for "investigation and appropriate action." 27 D.C. Reg. 484 (1980).

██ In view of this unambiguously expressed intent that complaints alleging standards of conduct violations be filed with the Board, we hold that an individual need not exhaust available Union remedies before seeking the Board's services. It is essential that individuals be completely free to petition the Board for redress of such grievances. *See N.L.R.B. v. Industrial Union of Marine and Shipbuilding Workers*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968).

The Union argues that despite the interest in unimpeded access to the Board, that exhaustion of union remedies is nevertheless required in areas of purely internal union affairs. We do not quarrel with this generally accepted principle. *See id.; Fish v. Huddell*, 60 App.D.C. 263, 51 F.2d 319 (1931). However, the complaints in this case alleged violations of standards that are the subject of express legislative concern and implicate public policy interests that far exceed what may be fairly viewed as an internal union affair. *See Fish v. Huddell, supra*, 60 App.D.C. at 264, 51 F.2d at 320 (internal management and administration of union affairs). Accordingly, we conclude that the Board had jurisdiction to consider Hairston's standards of conduct complaints. We now turn to the Board's final decision and order.

Although review of the Board's decision was initially in the Superior Court, D.C. Code § 1–605.2(12), our scope of review is precisely the same as that which we employ in cases that come directly before this court. *Stokes v. District of Columbia*, 502 A.2d 1006, 1010 (D.C.1985); *Kegley v. District of Columbia*, 440 A.2d 1013, 1018–19 (D.C.1982).

██ Thus, we must "examine the administrative record to determine whether there has been procedural error, whether there is substantial evidence in the record to support the [Board's] findings, or whether the [Board's] action was in some manner arbitrary, capricious, or an abuse of discretion." *Stokes v. District of Columbia, supra*, 502 A.2d at 1010; *Barry v. Wilson*, 448 A.2d 244, 246 (D.C.1982); *Kegley v. District of Columbia, supra*, 440 A.2d at 1019.[5]

---

4. Article XIV of the Union's bylaws provides: 14.1 Every member, without exception, agrees and pledges not to bring any action at law or in equity against the Labor Committee, or any officer or Executive Council member in his official capacity until first submitting his claim, grievance, complaint, appeal, or injury to the Labor Committee for action, decision, review, or adjudication, as the case may be.

5. The Union raises several issues which merit only brief discussion. The Union contends that the Board's failure to conduct a prehearing conference deprived it of adequate notice of the charges against which it had to defend. The

Substantial evidence supports the findings of the hearing examiner and the Board. That evidence demonstrated that the Union authorized Hairston to retain the counsel of his choice for his criminal defense. The Union further agreed to pay up to $100 per hour to defray the costs of that representation. However, only a week later, after learning of Hairston's choice of counsel, the Union rescinded its earlier agreement and advised Hairston to retain the services of a law firm under contract with the Union. While the decision was defended on the basis of budgetary concerns, such concerns were not an impediment to the extension of the offer only a week before. Further, the attorney retained by Hairston was viewed by some Union officials as a threat to Union interests. There is therefore substantial evidence to support the finding that the rescission of the offer was based upon Hairston's choice of attorney.

Thereafter, the Union distributed a flyer and published a magazine article to explain to the Union membership the quick about-face with regard to Hairston's legal representation. Hairston's testimony before the examiner, in which he detailed the numerous inaccuracies in both publications, provides substantial evidence that neither the flyer nor the article accurately reflected all of the facts concerning Hairston's case.

The Board concluded that the rescission of the prior authorization by the Union in conjunction with the distribution of the flyer and the article amounted to a failure by the Union to satisfy the required statutory standards of union conduct. The Board reasonably could find that the Union, by rescinding the prior authorization in the circumstances presented here, did not accord Hairston "fair and equal treatment" pursuant to D.C. Code § 1–618.3(a)(1).[6]

Accordingly, the order on appeal is affirmed.

---

record reveals that the hearing examiner granted the Union's motion for a prehearing conference which was held prior to the taking of any testimony. Two of the Union's remaining challenges—the Board's alleged misapplication of the burden of proof and the unconstitutionality of D.C.Code § 1–618.3(a)(1) as applied to this case—were not raised before the Board, either prior to the Board's decision, or after in the form of a Request for Reconsideration. *See* 27 D.C.Reg. 489 (1980). Not having been raised before the Board, the Superior Court was without jurisdiction to consider these issues on appeal. D.C.Code § 1–618.13(b), (c). We will not consider them here.

6. The Union claims that the Board, in reaching its conclusion, improperly relied upon *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). We are satisfied that the Board grounded its decision upon the Union's failure, in the Board's words, to "satisf[y] the statutory requirements regarding standards of union conduct." In reaching that conclusion, the Board correctly relied upon a general principle of fair representation found in *Hines*.