### DISTRICT OF COLUMBIA
### and
### Alfred Maury, Appellants,
### v.
### Patricia Joan THOMPSON, Appellee.

### Nos. 86–1051, 86–1681.

District of Columbia Court of Appeals.

Argued Dec. 5, 1990.

Decided June 17, 1991.

---

Donna M. Murasky, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, Washington, D.C., for appellants.

Joseph P. Hart, Washington, D.C., for appellee.

Before FERREN and SCHWELB, Associate Judges, and BELSON *, Associate Judge, Retired.

ON PETITION FOR REHEARING

FERREN, Associate Judge:

Appellant Patricia Thompson, an employee of the Northeast branch of the District of Columbia Public Library, sued the District and her supervisor, Alfred Maury, for intentional infliction of emotional distress, defamation, and assault and battery. On February 12, 1990, this division of the court held, in Part II of our opinion, that Thompson's claims against the District presented a "substantial question" whether all her alleged injuries—mental and emotional, as well as physical—were covered under the disability compensation provisions of the District's Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–624.2 to –624.-46 (1987). *District of Columbia v. Thompson,* 570 A.2d 277, 287, 288 (D.C.1990).

---

* Judge BELSON was an Associate Judge of the court at the time of argument. He became an Associate Judge, Retired, effective June 1, 1991.

These CMPA sections contain an exclusivity provision, D.C.Code § 1–624.16(c), see *infra* note 16, which, if applicable, would preclude Thompson's common law claims against the District. We concluded that if the disability provisions did cover these claims, Thompson could seek compensation from the District only through an administrative proceeding before the Department of Employment Services (DOES). *Id.* at 288. We therefore remanded to the trial court with directions to stay the proceeding against the District of Columbia until Thompson had had a reasonable time to test the reach of CMPA by filing with DOES for disability benefits. *Id.* at 288, 300–301.

In Part III of the opinion we considered the District's alternative argument. We held that, in possible contrast with CMPA's disability provisions, CMPA's comprehensive personnel evaluation provisions—more specifically, those in Subchapter 15 governing employee "performance ratings", D.C. Code §§ 1–615.1 to –615.5 (1987), and those in Subchapter 17 covering "adverse actions" and "grievances," *id.* §§ 1–617.1 to –617.3—did not preempt Thompson's right to bring common law tort actions against the District and Maury. *Thompson,* 570 A.2d at 289. Nor did these CMPA provisions require exhaustion of administrative remedies. *Id.* Therefore, had we not decided to stay the proceeding against the District because of possible preemption by the CMPA disability provisions, we would have found no other CMPA bar to reaching the merits of the common law claims against the District. Furthermore, because we perceived no CMPA bar against Thompson's suit against Maury, *id.* at 288 & n. 7, we reached the merits on those claims. In doing so, we dismissed the claim for intentional infliction of emotional distress (Part IV), *id.* at 291, 300, and re-

versed and remanded for a new trial the claims for defamation (Part V), *id.* at 291–298, 301, and for assault and battery (Part VI), *id.* at 298–300, 301. We recognized, moreover, that if DOES were to rule that Thompson's claims against the District were not governed by CMPA's disability provisions, our rulings on defamation and assault and battery applicable to Maury would be available to Thompson in renewed trial court proceedings seeking derivative liability against the District. *Id.* at 288, 301.

After issuance of our first opinion and order, 580 A.2d 144, the District and Maury petitioned for rehearing.[1] We granted the petition, without vacating our opinion and order, primarily to give further consideration to Part III (and, consequently, to Parts IV, V, and VI) of that opinion. Accordingly, we have focused once again on the District's alternative argument under CMPA: that the comprehensive statutory provisions covering employee "performance ratings" (Subchapter 15) and "adverse actions" and "grievances" (Subchapter 17) provide exclusive remedies for employee claims arising out of the kinds of employer activities—performance evaluation and discipline—identified in those subchapters. In short, we reconsider whether those CMPA provisions preempt, and thus preclude court action against the District and Maury on, Thompson's claims of defamation and of intentional infliction of emotional distress arising out of the employment relationship.[2] We are now persuaded by the preemption argument. Accordingly, while we reaffirm several parts of our earlier opinion—the introduction (except for the last two, dispositional sentences), Part I (facts and proceedings), Part II (CMPA disability provisions), and Part VII (reassignment to different trial judge)—we vacate Parts III, IV, V,[3] and VIII (summary of

---

1. Because the District filed its petition for rehearing on behalf of both Maury and the District, all arguments which we label the "District's" extend to both appellants.

2. The District concedes that Thompson's assault and battery claims against Maury and the District are not properly characterized as actions covered by CMPA Subchapters 15 and 17 and

thus are properly brought in court as independent tort actions.

3. In *Moss v. Stockard,* 580 A.2d 1011, 1013, 1018 & n. 12, 1020–1022 (D.C.1990), this court incorporated and relied on our analysis in Part V of our earlier opinion. That analysis accordingly survives.

disposition) and modify Part VI to delete reference to the defamation claim.

## I.

### A.

A jury awarded Thompson damages of $530 for assault and battery, $35,000 for defamation, $42,500 for intentional infliction of emotional distress, and $280,000 for loss of wages or diminished earning capacity attributable either to the defamation or to the intentional infliction of emotional distress. *Thompson*, 570 A.2d at 280. Thompson's defamation and emotional distress claims are based on twenty-two memoranda that her supervisor, appellant Maury, had written during Thompson's two-year employment beginning in May 1981 as a library technician at the Northeast branch of the District's Public Library. As we noted in our earlier opinion:

> These memoranda, beginning in June 1981, repeatedly advised and warned [Thompson] to follow the correct leave request procedures and notified her of problems in the performance of her duties, including conflicts with a summer employee, inaccuracy in putting information into the computer, and insubordination and rudeness to staff and patrons. Thompson claimed that all these memoranda were false, that they defamed her, and that, by writing the memoranda and harassing her, Maury intentionally had inflicted emotional distress. Thompson testified that some of the memoranda blamed her for not doing tasks when she either had been told not to do them or had been asked to do other work. Thompson also testified that some of the memoranda either mischaracterized her disputes with Maury or were absolutely false. She felt some of the other memoranda were excessively critical, and she said they contained complaints that Maury had not told her in person.

*Id.* at 281. Thompson's emotional distress claim also rests on the following actions:

> [Maury] approved her leave and then changed her status to absence without leave; he refused to consider her for promotion to the next grade level or to give her the computer test she asked for; he isolated her from the other employees; he requested statements from her doctor as to her limited hours; he wrote memoranda on her excessive leave; and he assaulted her and lied about it, resulting in her job loss.[4]

*Id.* at 290.

### B.

Before addressing Maury's memoranda and other alleged tortious conduct, we believe it would be helpful to outline the statutory scheme that, according to the District, provides the exclusive route to resolving Thompson's claims. CMPA establishes a merit personnel system that, among other things, provides for (1) employee "performance ratings," including "corrective actions" when necessary; (2) employee discipline through "adverse action" proceedings; and (3) prompt handling of employee "grievances." *See* D.C.Code §§ 1–615.1 to –615.5 and 1–617.1 to –617.3. As a general rule, whether a public employee defends a corrective or adverse action by the employer, or initiates a grievance proceeding against the employer, the matter will be resolved either under detailed CMPA procedures or under a CMPA-sanctioned collective bargaining agreement between the employing agency and a public employees' labor union—but not both. *See id.* §§ 1–615.3(c), –615.4(d), –617.3(d).

More specifically, subchapter 15 of CMPA, D.C.Code §§ 1–615.1 to –615.5, requires the Mayor, "after negotiation with appropriate labor organizations," to establish a "performance-rating plan" for evaluating all covered personnel. *Id.* § 1–615.1. The plan, at a minimum, must provide for

---

4. Thompson received a proposed notice of discharge for cause on June 22, 1983. The notice stated the reason for her termination was "Discourteous Treatment of your Supervisor." *Thompson*, 570 A.2d at 284. Subchapter 17 of CMPA, D.C.Code § 1–617.1(d), permits dismissal for "cause" based (among other things) on: "(11) Discourteous treatment of the public, supervisor, or other employees[.]"

annual performance ratings "used to improve employee performance." *Id.* § 1–615.2. Employees shall be rated according to at least a five-level scale from "outstanding" to "unsatisfactory;" "may be rated unsatisfactory only after a 90–day advance warning period;" and may be removed only by the "adverse action" procedures outlined in Subchapter 17 of CMPA, D.C.Code §§ 1–617.1 to –617.3, "unless otherwise provided by a negotiated contract" with a public employees labor union. *Id.* § 1–615.3.

An employee may obtain an impartial review of a performance rating by the board of review within his or her own particular agency, subject to further review by the Office of Employee Appeals (OEA), *id.* §§ 1–606.3(a), –615.4, and by the Superior Court. *Id.* § 1–606.3(d). Employees covered by a collective bargaining agreement, however, may be subject to performance rating plans and review procedures that differ from those provided under CMPA itself. *See id.* §§ 1–615.4(d), –615.5.[5]

In Subchapter 17, CMPA establishes procedures for processing employee "grievances."[6] *Id.* § 1–617.2. "The grievance system shall provide for the expeditious adjustment of grievances and complaints and the prompt taking of appropriate corrective action when the complaint or grievance is, upon review, found to be justified." *Id.* Subchapter 17 also governs "adverse actions," such as removal for cause. *Id.* §§ 1–617.1, –617.3. When confronted by an adverse action, an employee is entitled to receive a written copy of the charges, to have time to file a written answer, and to receive a decision "within 45 calendar days of the date that charges are preferred." *Id.* § 1–617.3(a)(1)(D).

The employee may appeal any adverse action or decision on an employee-initiated grievance to OEA, with the right of judicial review in Superior Court. *Id.* §§ 1–606.3(a) and (d), –606.4(e), –617.3(b); *see Stokes v. District of Columbia,* 502 A.2d 1006, 1011 (D.C.1985) (affirming Superior Court reversal of OEA's order reinstating electrical foreman at juvenile correctional institution). However, as in the case of performance rating review, "[a]ny system of grievance resolution or review of adverse actions negotiated between the District and a labor organization shall take precedence over" Subchapter 17 procedures, including OEA review. D.C.Code § 1–617.3(d).[7]

If an employee grievance goes to arbitration pursuant to a collective bargaining agreement, the union and the employee may appeal the arbitration award to the Public Employee Relations Board (PERB), subject to judicial review in Superior Court. *Id.* §§ 1–605.2(6) and (12). Employees dissatisfied with their union's representation may appeal to PERB, and then seek judicial review in Superior Court, if they have a basis for alleging improper conduct. *See id.* §§ 1–605.2(3), –605.2(9), –605.2(12); *Hawkins v. Hall,* 537 A.2d 571, 574 (D.C. 1988) (Board of Education employees who claimed Board and union unlawfully with-

---

5. For instance, employees covered by a collective bargaining agreement might not have the option of seeking review of an adverse action before the Office of Employee Appeals (OEA). The OEA's regulations recognize that it lacks jurisdiction (1) when a collective bargaining agreement "provides exclusive negotiated procedures for adverse action, performance ratings, grievances or reduction-in-force review," and (2) when a collective bargaining agreement permits an employee to choose between the statutory and negotiated review procedures and an employee opts to use the negotiated procedures. OEA Proposed Regulations § 601.2, 27 D.C.Reg. 4350, *adopted as final,* 27 D.C.Reg. 5449 (1980).

6. CMPA broadly defines a grievance as "any matter under the control of the District government which impairs or adversely affects the interest, concern, or welfare of employees." D.C.Code § 1–603.1(10).

7. Any employee normally represented by a union may, nonetheless, elect to present a grievance to the employer at any time without the intervention of the labor organization—provided the union is given an opportunity to be present and to offer its views—but "adjustments of grievances must be consistent with the terms of the applicable collective bargaining agreement." D.C.Code § 1–618.6(b). We know from OEA Regulations that once an employee who is covered by a collective bargaining agreement that permits an employee to choose between statutory and negotiated procedures elects to use the negotiated procedures, he or she may not use CMPA's employee-initiated procedures to appeal that matter to OEA. See *supra* note 5.

held union dues from their wages required to exhaust administrative remedies at PERB before seeking judicial relief); *Fraternal Order of Police v. Public Employee Relations Bd.,* 516 A.2d 501, 504 (D.C.1986) (upholding trial court order affirming PERB decision that union improperly rescinded agreement to pay member's outside counsel fees).

### C.

 Thompson was a member of the Public Library employees' exclusive bargaining agent, The American Federation of State, County and Municipal Employees, AFL–CIO (AFSCME). Although her claims for defamation and emotional distress, therefore, must be tested by reference to the Library's contract with AFSCME, the applicable principles of preemption—of exclusiveness of remedy—are the same whether an employee's rights and obligations are governed by a collective bargaining agreement or by the provisions of CMPA itself. We say this because CMPA and a CMPA-sanctioned union contract are alternative governing documents generally covering the same scope of employer-employee rights and duties. We therefore consider, next, how the CMPA scheme and Thompson's claims intersect. We discuss not only how the union contract applies but also how the CMPA provisions themselves would apply (absent a union contract) to the kinds of complaints Thompson has made.

The District argues, on rehearing, that some of Maury's memoranda can be characterized as "letters of direction," *see Thompson,* 570 A.2d at 282–283, "letters of warning," *see id.,* and "written reprimands" permitted as "corrective actions" by the collective bargaining agreement between the District's Public Library and AFSCME.[8] We agree. Similarly, some of these memoranda come within the provisions of CMPA itself authorizing each agency to use "corrective measures" such as "reprimands."[9]

We also agree with the District that other Maury memoranda appear to be directed at more serious forms of discipline under CMPA, such as discharge for an unsatisfactory "performance rating," *see id.* at 283–84, or for "cause" defined, for example, as "incompetency" or "inexcusable neglect of duty," or "insubordination."[10] These memoranda, similarly, could serve as the basis for a disciplinary action under the Library–AFSCME contract.[11]

**8.** Article XV, Section 1, of the Library's agreement with AFSCME provides for "corrective actions" that include "counseling" by the employee's immediate supervisor, an "oral reprimand," a supervisor's "letter of direction/warning," and a supervisor's "written reprimand." CONTRACT BETWEEN THE DISTRICT OF COLUMBIA PUBLIC LIBRARY, DISTRICT OF COLUMBIA GOVERNMENT AND AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL–CIO, COUNCIL 20, LOCALS 1808 AND 877 at 18–19 (March 1982) [LIBRARY-AFSCME CONTRACT].

**9.** CMPA provides: "The Mayor ... shall issue rules and regulations establishing internal agency corrective, rather than punitive, measures. Adverse action procedures shall not be in conflict with these corrective measures nor with any provisions of this subchapter. Such rules and regulations may provide for reprimands and for suspensions for 30 days or less. The appropriate personnel authority shall administer the disciplinary procedures established under this subsection, subject to the provisions of subchapter VI of this chapter. The extent of the corrective action shall reflect the severity of the infraction." D.C.Code § 1–617.1(a).

**10.** CMPA provides that nonprobationary employees and certain others "may be suspended for more than 30 days, reduced in rank or pay, or removed ... only for cause and only in accordance with the provisions of this subchapter and subchapter VI of this chapter. The extent of the corrective action shall reflect the severity of the infraction." D.C.Code § 1–617.1(b). "Cause" is defined to embrace twenty-two categories, including: "Fraud in securing appointment or falsification of official records," "Incompetency," "Inefficiency," "Inexcusable neglect of duty," "Insubordination," "Dishonesty," "Drunkenness on duty," "On-duty use of drugs not prescribed and/or obtained illegally," "Inexcusable absence without leave," "Conviction of a felony," "Engaging in a strike." *Id.* § 1–617.1(d) (Supp.1990). *See District of Columbia Dep't of Corrections v. Teamsters Union Local No. 246,* 554 A.2d 319, 326 (D.C.1989) (affirming trial court order that enforced arbitration award reinstating employee fired for behavior not within express terms of CMPA's definition of "cause".)

**11.** Article XV, Section 2 ("Disciplinary Actions"), of the Library–AFSCME contract, see *supra* note 8, requires the employer to make a "careful inquiry" before issuing a notice of pro-

The District adds—and again we agree—that Thompson was not limited to defending herself from corrective or disciplinary actions based on the Maury memoranda; she was entitled to initiate grievance proceedings under CMPA, see *supra* notes 6 and 7, or under the Library–AFSCME contract.[12] A grievance would include many, if not all, of the items that caused Thompson distress: for example, the denial of leave, the allegedly inaccurate letters of warning, and the charges of excessive leave-taking. See *supra* note 6.

Although Thompson had many opportunities to challenge what she perceived as unfair treatment, she filed grievances—through her union—on only two occasions. In May 1982, Thompson used the Library–AFSCME grievance procedure to seek additional computer training and an upgrade in job classification. After a meeting with

Thompson and her AFSCME representative, Maury, submitted a memorandum to AFSCME denying Thompson's grievance. Thompson elected not to process the grievance beyond this first step.[13]

Thompson also sought to use her collective bargaining right to challenge her proposed termination.[14] On August 2, 1983, AFSCME processed a grievance for Thompson through three of the four steps specified in the collective bargaining agreement. See *supra* note 13. A hearing was held on September 8, and a decision was issued on September 15 upholding her termination. AFSCME declined to take the grievance to step four, arbitration, and Thompson took no further appeals.[15]

In sum, a public employee such as Thompson has comprehensive rights to notice, hearing, appeal, and judicial review of

posed disciplinary action. Article XV, Section 2, further provides—with respect to employees for whom the employer proposes a furlough of more than fourteen days, furlough without pay, reduction in rank or compensation, or discharge—that the employee receive thirty days' notice, with an opportunity to reply, followed by a decision at the "earliest possible date." The notice must inform the employee of the reason for the action and of the right of appeal under "the prescribed steps of the Grievance Procedure." *Id.*

**12.** Article XVI, Section 2, of the Library–AFSCME Contract provides: "Any employee of the District of Columbia Public Library who has just cause to believe that his/her rights under the working regulation of the District of Columbia Public Library as stipulated by this Agreement have been affected adversely shall be entitled to submit a grievance...."

**13.** Article XVI, Section 2, of the Library–AFSCME Contract allows Thompson to present her grievances through four steps. The first step is an oral presentation to the employee's immediate supervisor within ten working days of the employer's allegedly unfair action or the employee's knowledge of it. The supervisor must reply orally or in writing within five days. If the grievance is unresolved, step two provides for a hearing, at the union's request, before the department head, with a response required within five working days of the hearing. If necessary, the third step is a hearing, at the union's request, before the Director of the Public Library, who must respond within five working days after the hearing. The fourth step provides for arbitration invoked by the union's

written notice to the Library Director within fifteen working days of the decision at step three.

**14.** The Library's July 25, 1983 final notice of termination informed Thompson of her right under the Library–AFSCME contract "to appeal this decision using the appropriate steps outlined in the negotiated Grievance Procedure." This notice complied with the requirements of the Library–AFSCME contract. See *supra* note 11. The District argues this notice was defective because it did not inform Thompson of her right to appeal her termination to the Office of Employee Appeals. D.C.Code § 1–606.4(e). The District, therefore, in effect, asks us to conclude that the negotiated notice procedures are defective in light of the statutory notice requirement of § 1–606.4(e). *See District of Columbia v. Daniels*, 523 A.2d 569, 570 (D.C.1987) (remanding case to OEA because police department failed to notify employee of right to appeal to OEA). The only issue in *Daniels*, however, was the claimed inappropriateness of an agency notice that told an employee "no further administrative appeal is permitted." *Id.* at 570. The scope of an employee's right to receive notice under a union contract was not at issue. In Thompson's case, the agency complied with the explicit terms of a negotiated contract. Under these circumstances, there was no defect in the notice, especially in light of D.C.Code §§ 1–606.2(b), –617.3(d), which clearly state that negotiated procedures for adverse action review need not conform to the statutory notice provisions of § 1–606.4(e).

**15.** If Thompson was dissatisfied with AFSCME's representation, CMPA permitted her to file a

performance ratings and adverse personnel actions under CMPA and under any CMPA-endorsed union contract. Moreover, both CMPA and a union contract afford the employee rights to file grievances against the governmental employer for any matter "which impairs or adversely affects" the employee's "interest, concern, or welfare." D.C.Code § 1–603.1(10); *supra* note 6. The employee also has rights against the union for inadequate representation. See *supra* Part I.B.; note 15. The District argues that all of Thompson's complaints except the one for assault and battery were cognizable under CMPA Subchapters 15 and 17 or under the Library–AFSCME Contract. The District accordingly urges us to hold that CMPA's remedies are exclusive and, as a consequence, that Thompson is precluded from bringing her defamation and emotional distress claims to court.

## II.

■ The CMPA provisions that govern "performance ratings," "adverse actions," and "grievances" (which we sometimes refer to collectively as "personnel evaluation provisions")—unlike the CMPA disability provisions—do not provide that they are exclusive and preclude common law claims. *Compare D.C.Code* §§ 1–615.1 to –615.5

complaint with PERB, subject to judicial review in Superior Court. See *supra* Part I.B.

16. The exclusivity provision governing disability claims, D.C.Code § 1–624.16(c), provides:

The liability of the District of Columbia government ... under this subchapter ... with respect to the injury or death of an employee, is exclusive and instead of all other liability of the District of Columbia government ... to the employee ... in a direct judicial proceeding, [or] in a civil action....

17. Our analysis is premised on the assumption that, but for CMPA, District employees would have common law tort remedies available against their public employer, including their supervisors. The various subchapters of CMPA became law at different times beginning March 3, 1979 and extending as late as January 1, 1980 and in some cases thereafter. *See* D.C.Code § 1–637.1 (1987). Immediately before CMPA became effective, District employees were subject to the disability provisions of the Federal Employees' Compensation Act (FECA), Pub.L. No. 89–554, 80 Stat. 532 (1966), 5 U.S.C. §§ 8101–8193, and to the personnel evaluation

*and* 1–617.1 to –617.3 *with id.* § 1–624.16(c) [16]; *see Thompson,* 570 A.2d at 289. The first question we must revisit, therefore, is whether the failure of the legislature to provide explicitly for exclusive remedies in CMPA §§ 1–615.1 to –615.5 and §§ 1–617.1 to –617.3 was intended to leave employees free to pursue all claims arising out of their employment as common law actions in court, unless covered by the CMPA disability provisions.[17]

## A.

In our earlier opinion we concluded that CMPA's personnel evaluation provisions did not preempt common law remedies for three reasons. First, we indicated that these provisions and CMPA's disability provisions should be construed with reference to each other. We implied that, by writing an exclusivity provision into the disability section of the act, the Council had demonstrated its familiarity with the use of such language and thus that the Council's failure to make the personnel evaluation provisions exclusive was intentional. *Thompson,* 570 A.2d at 289. Second, drawing on a traditional canon of statutory construction, we said we would "not construe a statute as altering the common law beyond

provisions of the Civil Service Reform Act of 1978 (CSRA), Pub.L. No. 95–454, 92 Stat. 1111 (codified, as amended, in various sections of 5 U.S.C.), as well as to earlier federal laws incorporated into District of Columbia law. *See* D.C. Code §§ 1–213(c), –242(3). The courts have held that CSRA preempts common law remedies. *See David v. United States,* 820 F.2d 1038, 1043 (9th Cir.1987); *Lehman v. Morrissey,* 779 F.2d 526, 528 (9th Cir.1985) (per curiam). It is therefore questionable whether District employees have had common law remedies available for defamation or emotional distress actions against their public employer before CMPA. The common law, however, generally applies in the District of Columbia absent statutory repeal, *Nelson v. Nelson,* 548 A.2d 109, 112 & n. 3 (D.C.1988), and none of the parties has questioned the availability of common law remedies absent CMPA. For these reasons, we are willing to assume, without deciding, that at the instant CSRA became inapplicable to public employees, common law remedies for such causes of action became available unless preempted by CMPA. *Cf. Newman v. District of Columbia,* 518 A.2d 698, 706 (D.C.1986) (exclusivity provision in CMPA's disability compensation scheme does

what the words of the statute require." *Id.* (citing *Dell v. Department of Employment Services,* 499 A.2d 102, 107 (D.C. 1985)).[18] Finally, although "some federal courts have ruled that comprehensive administrative schemes such as CMPA preempt common law claims," *id.,* we distinguished these cases on the ground that they "were decided on the basis of federal preemption of state law, a doctrine not applicable in the present case." *Id.* (footnote omitted).

 We are no longer persuaded by our previous analysis. In the first place, statutory sections should not be read with reference to each other (sometimes called *in pari materia* ) if their respective subject matters and purposes are different. *See Holt v. United States,* 565 A.2d 970, 975 (D.C.1989) (en banc) ("Statutory provisions *in pari materia* relate to the same subject matter or have the same purpose or object") (citations omitted). Moreover, although courts have indicated that statutes adopted at the same time are more likely to be *in pari materia* than those enacted at different times, *compare Tabas v. Crosby,* 444 A.2d 250, 255 (Del.Ch.1982), *with State v. Loscomb,* 291 Md. 424, 435 A.2d 764, 768 (1981), we have said that this doctrine "does not refer primarily to coincidence of enactment," *Holt,* 565 A.2d at 975; the focus is on subject matter and purpose. *See id.* The CMPA disability compensation provisions were intended to displace the common law with a compensation scheme that provided fixed, immediate benefits for on-the-job injuries regardless of fault. *See Newman v. District of Columbia,* 518 A.2d 698, 704 (D.C.1986). In contrast, the personnel evaluation provisions established a new, comprehensive, merit-based system for evaluating employees, *see Stokes,* 502 A.2d at 1009—a system that includes exten-

sive provisions for filing grievances and appeals of working conditions and of adverse personnel actions. These two groups of CMPA provisions, therefore, clearly have altogether different subject matters and purposes. Although knit together by their inclusion in one large piece of legislation—one omnibus chapter of the District of Columbia Code—intended to cover a diverse array [19] of issues inherent in public employment, the provisions governing personnel evaluation (Subchapters 15 and 17) and those governing disability compensation (Subchapter 24) may be treated as separate statutes.

More specifically, the CMPA personnel evaluation and disability compensation provisions, respectively, have altogether different legislative antecedents. We noted in *Newman* that CMPA's disability provisions in Subchapter 24 "[f]or the most part ... track those of its federal forerunner, FECA"—the Federal Employees' Compensation Act. *Newman,* 518 A.2d at 704. FECA had antecedents reaching back to 1912, *see* 5 U.S.C. § 751 (1964 ed.) (discussion of short title). It was comprehensively reorganized and revised in 1966 in Pub.L. No. 89–488, 80 Stat. 252 and codified at 5 U.S.C. §§ 8101–8193 (1988). Until CMPA became effective, FECA expressly applied to employees of the District of Columbia. *See* 5 U.S.C. § 8139 (1988). FECA has an exclusivity provision. *See* 5 U.S.C. § 8173 (1988).

In contrast, CMPA's personnel evaluation provisions have no direct federal source. CMPA's Subchapter 15 (performance rating) is analogous to Chapter 43 (performance rating) of 5 U.S.C. §§ 4301–4305 (1988), which had its origins in the Performance Ratings Act of 1950, Pub.L. No. 81–873, 64 Stat. 1098. CMPA's Subchapter 17 (adverse actions; grievances) is

not bar common law claim for intentional infliction of emotional distress).

**18.** *See also Shaw v. North Pennsylvania Ry. Co.,* 101 U.S. 557, 565, 25 L.Ed. 892 (1879) ("No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.")

**19.** CMPA covers not only personnel evaluation and disability compensation but also a variety of other concerns such as equal employment opportunity (Subchapter 7), classifications of service (Subchapters 8–11), classifications of compensation (Subchapter 12), employee rights and responsibilities (Subchapter 16), labor-management relations (Subchapter 18), safety, health, and life insurance (Subchapters 21–23), and retirement (Subchapter 27).

analogous to, though substantially different from, Chapter 75 (adverse actions) of the Civil Service Reform Act of 1978 (CSRA), Pub.L. No. 95–454, 92 Stat. 1111, codified at 5 U.S.C. §§ 7501–7514 (1988), and CSRA Chapter 77 (appeals), 5 U.S.C. §§ 7701–7703 (1988). Chapters 75 and 77, in turn, are traceable to the comprehensive revision of Title 5 of the U.S.Code in 1966, Pub.L. No. 89–554, 80 Stat. 532, which also included revisions of FECA. These CSRA chapters and their predecessors expressly applied to District employees, see 5 U.S.C. § 4301(1)(F) (1977), and do not contain an exclusivity provision.

The Council of the District of Columbia adopted CMPA because home rule legislation had called upon the Council to establish a "District government merit system" to replace legislation Congress previously had enacted for the District of Columbia, "including, without limitation," legislation to cover "appointments, promotions, discipline, separations, pay, unemployment compensation, health, disability and death benefits, leave, retirement, insurance, and veterans' preference." D.C.Code § 1–242(3) (1987). Accordingly, the Council was called upon to enact disability compensation legislation corresponding to a long-standing federal statute (FECA) and also to adopt personnel evaluation legislation covering performance ratings and adverse actions/grievances which, respectively, had different federal sources from one another. As it turned out, in adopting CMPA the Council tracked FECA, see Newman, 518 A.2d at 704, but developed quite different personnel evaluation provisions from those Congress adopted for federal employees.

Given this history showing legislative antecedents in different statutes, enacted at different times, though codified in the same title of the U.S.Code, and further given the fact that the CMPA personnel evaluation and disability compensation subchapters reflect altogether different purposes and subject matters, we conclude that these CMPA subchapters were developed for all practical purposes as separate pieces of legislation, though contained in the same omnibus act. These disability and personnel evaluation provisions, therefore, do not meet the criteria for interpretation *in pari materia*.[20]

■ Second, the venerable canon that would have us strictly construe a statute against altering the common law creates "a rebuttable presumption." *Monroe v. Foreman*, 540 A.2d 736, 739 (D.C.1988) (construed No–Fault Act to preclude common law negligence action for personal injuries from automobile accident). We have em-

---

**20.** Our dissenting colleague disagrees with this majority opinion primarily for three related reasons: he believes all the statutory provisions at issue should be construed *in pari materia;* he notes that the "exclusive" remedy language found in the disability compensation provisions, D.C.Code § 1–624.16(c), *supra* note 16, does not appear in the personnel evaluation provisions; and he therefore concludes that the Council intended these latter provisions not to incorporate an exclusive form of remedy. He bases his premise (*in pari materia*) on language from cases like *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983), which he says "fits this case like a glove." *Post* at 638. We believe the language does not fit at all. Justice Blackmun described *Russello* as "yet another case concerning the Racketeer Influenced and Corrupt Organization (RICO) chapter of the Organized Crime Control Act of 1970." *Id.* at 17, 104 S.Ct. at 297. More specifically, *Russello* concerned interpretation of the word "interest" as used in one subsection of the Act after another. The question presented was whether the words "any interest ... acquired" in § 1963(a)(2) could embrace "profits" of a

corporation or were limited, as in § 1963(a)(1), to an equity "interest in the enterprise"—in which case the petitioner's evil deeds would not have been covered by the statute. *See id.* at 22–23, 104 S.Ct. at 300. The Court concluded that § 1963(a)(2) had a more expansive reach than § 1963(a)(1) and thus reached the petitioner's conduct—a classic use of construction of closely linked subsections *in pari materia*. As we have said in the text above, however, the instant case concerns a statute with subchapters—personnel evaluation and disability compensation—that have altogether different purposes, subject matters, and legislative antecedents. Moreover, when the Supreme Court ruled in *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), that CSRA, see *supra* note 17, precluded a federal employee from suing under the Back Pay Act, no one argued against such preclusion by citing the absence of an exclusivity provision, in contrast with the presence of an exclusivity provision in FECA, 5 U.S.C. § 8173. Respectfully, therefore, we disagree with our colleague. As we understand the caselaw, these subchapters should not be construed *in pari materia*.

phasized that " '[t]he rule that statutes in derogation of the common law are to be strictly construed does not require such adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure.' " *Id.* (quoting *Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930)). Moreover, in attempting to ascertain legislative intent for a modern, comprehensive, regulatory statute that creates new rights and remedies, we are mindful that "[a]n exception to the rule of strict construction is customarily made in the case of a statute which purports to provide a complete system of law covering all aspects of the subject with which it deals...." 3 N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 61.03 (4th ed. 1986); *see Texas and Pacific Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 440–42, 27 S.Ct. 350, 355–56, 51 L.Ed. 553 (1907) (because Interstate Commerce Act intended to afford comprehensive means for redressing wrongs resulting from unjust rate discrimination, shipper cannot sue at common law for excessive freight rates). Accordingly, in such a situation—which appears to be the instant case—the presumption of strict construction against repeal of common law remedies may not easily survive an in-depth inquiry into legislative purpose. *See Monroe,* 540 A.2d at 739, 741–43 (statutory language and entire legislative scheme of No–Fault Act rebuts presumption that common law negligence action remains available in case of automobile accident); *cf. Block v. Community Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2455–56, 81 L.Ed.2d 270 (1984) ("[T]he presumption favoring judicial review of administrative action may be overcome by inferences of [legislative] intent drawn from the statutory scheme as a whole.")

### B.

■ When a statute creating new rights and remedies does not expressly exclude common law remedies or declare new remedies exclusive, we decide whether such remedies remain available by looking initially at "the purpose of [the statute], the entirety of its text, and the structure of review that it establishes." *United States v. Fausto,* 484 U.S. 439, 444, 108 S.Ct. 668, 671, 98 L.Ed.2d 830 (1988) (Civil Service Reform Act of 1978 precludes employee's suit under Back Pay Act). "Whether ... a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block,* 467 U.S. at 345, 104 S.Ct. at 2453 (holding consumers were precluded from obtaining judicial review under Agricultural Marketing Agreement Act of 1937 of milk market orders issued by Secretary of Agriculture because would disrupt complex administrative scheme).

### 1. Purpose of CMPA

■ CMPA was designed to replace a "disjointed, decentralized personnel system [which was frequently alleged to tolerate] [p]atterns of abuse, neglect, incompetence, error, [and] alleged retaliation by superiors against wronged employees...." COUNCIL OF DISTRICT OF COLUMBIA, DISTRICT OF COLUMBIA COMPREHENSIVE MERIT PERSONNEL ACT OF 1978, COMM. REPORT ON BILL NO. 2-10, 24 (July 5, 1978), [COMMITTEE REPORT], *reprinted in* HOUSE COMM. ON THE DIST. OF COLUMBIA, DISTRICT OF COLUMBIA GOVERNMENT COMPREHENSIVE MERIT PERSONNEL ACT OF 1978 AND REPORT OF THE COUNCIL OF THE DISTRICT OF COLUMBIA, 96TH CONG., 1ST SESS. 142 (Comm. Print 1979). The then-existing personnel system was "in disarray" and "chaos"; it was an "inefficient hodgepodge system [that] ignore[d] the rudimentary merit rules" and "awkwardly meshed" the District personnel apparatus with the federal personnel system. COMMITTEE REPORT at 26. This "incredibly inefficient, often counter productive" system required "the creation of a truly uniform system of merit personnel administration." *Id.*

By enacting CMPA, the Council of the District of Columbia fulfilled the mandate

of the District of Columbia Self–Government (Home Rule) Act [21] to develop its own comprehensive merit personnel system to "replace the federal system which had previously controlled the District government's relations with its employees." *Hawkins,* 537 A.2d at 574; *see Newman,* 518 A.2d at 703; *American Fed'n of Gov't Employees v. Barry,* 459 A.2d 1045, 1049 (D.C.1983). The Council recognized the inadequacy of the existing personnel system that "not only encourage[d] abuse but [was] deficient in adequate procedures to protect the employees once those abuses have occurred." COMMITTEE REPORT at 26. The Council was concerned about complaints of "threats and coercion [used] to force employees with personnel grievances to withdraw them or to keep them to themselves." *Id.* at 25. The Council intended the CMPA to remedy these problems:

—City-wide rules and regulations will assure consistent application of personnel policies in all government agencies.

—Judicial review is provided for all decisions of the Public Employee Relations Board and Office of Employee Appeals to assure an impartial review of government administrative decisions affecting personnel.

—The opportunity for retaliation against employees exercising their right will be minimized by the careful provisions granting employee rights and responsibilities; authority for independent review by the Corporation Counsel; and finally,

appellate authority within the Office of Employee Appeals and the courts. *Id.* at 42.

In sum, in enacting CMPA, the Council intended to create "a modern, flexible, comprehensive city-wide system of public personnel administration" that would provide "for the efficient administration of the District personnel system and establish impartial and independent administrative procedures for resolving employee grievances." COMMITTEE REPORT at 39, 40.[22]

## 2. Entirety of CMPA Text; Structure of Review

The statutory provisions outlined above in Part I.B. reflect the comprehensive purpose just outlined, including significant employee rights not only in the disciplinary process but also in the grievance system. Moreover, CMPA provides for a comprehensive system of administrative review of employer actions—whether under CMPA itself through OEA or under a union contract subject to PERB—and in each case subject to judicial review in Superior Court. See *supra* Part I.B.

The legislative history does not reflect whether, in enacting CMPA, the Council intended to foreclose tort remedies. The Committee Report, however, did stress a role for the courts, but only a limited role: judicial review of administrative decisions. *See* COMMITTEE REPORT at 42. The Committee Report called significant the creation of "[a]n Office of Employee Appeals, which is an independent personnel appeals authority

---

**21.** Pub.L. No. 93–198, § 422(3), 87 Stat. 774, 791 (1973) (codified at D.C.Code § 1–242(3) (1987)).

**22.** The statute itself incorporates these purposes:
§ 1–601.2. Purpose.
 (a) The Council of the District of Columbia declares that it is the purpose and policy of this chapter to assure that the District of Columbia government shall have a modern flexible system of public personnel administration, which shall:
 \* \* \* \* \* \*
 (2) Create uniform systems for personnel administration among the executive departments and agencies ...;
 \* \* \* \* \* \*
 (4) Insure the efficient administration of this personnel system;

 (5) Establish impartial and comprehensive administrative or negotiated procedures for resolving employee grievances;
 (6) Provide for a positive policy of labor-management relations including collective bargaining between the District of Columbia government and its employees[.]
D.C.Code § 1–601.2.

which will hear *all* personnel-related employee appeals." COMMITTEE REPORT at 43 (emphasis added). While this language does not say the OEA channel is exclusive (in part because the Council was careful not to foreclose the District and its unions from bargaining for creation of alternative review procedures), it appears the Committee Report was not contemplating the possibility of still other remedies.

▮ It would seem, therefore, from the purpose and text of CMPA, including its judicial review provisions, that the Council "plainly intended"[23] CMPA to create a mechanism for addressing virtually every conceivable personnel issue among the District, its employees, and their unions—with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum.

### III.

▮ An additional way of testing legislative intent—*i.e.*, whether CMPA's comprehensive remedial system should be understood to preclude, or to leave room for, common law tort remedies—is to focus on whether the continued availability of common law damage remedies would complement or undermine the statutory scheme as a whole. *See Block,* 467 U.S. at 349, 104 S.Ct. at 2455-56.

The District argues that the costs associated with the availability of common law remedies are substantial and would undermine CMPA's merit personnel system. More specifically, says the District, an overlay of tort remedies would be costly not only directly in terms of money, but also indirectly in terms of the time and energy

managers would have to devote to defending their actions in two dispute-resolving systems. The District expresses concern that employees who lose at the administrative level—with its efficient time frames and simplified procedures—might compel supervisors to undergo lengthy proceedings a second time over the same claim, this time in court, simply for telling the truth.

▮ We do not agree that two dispute-resolving options—administrative review and tort litigation—would necessarily lead to duplicative handling of the same dispute; doctrines of claim preclusion and election of remedies, for example, are usually available to prevent that particular evil. But we do agree that the burdens of an employer's having to anticipate and deal with two, often substantially different, remedial systems (one of them protracted litigation) available at the election of each employee are likely to have a chilling effect on mandated and bargained personnel procedures—an effect that could debilitate the very foundation of the merit personnel system. For example, supervisors are likely to be hesitant to enforce employee discipline, preferring silence to the fear of being hauled into court for fulfilling their statutory duties. *Cf. Bush v. Lucas,* 462 U.S. 367, 388-89, 103 S.Ct. 2404, 2416-17, 76 L.Ed.2d 648 (1983) (Court declines to supplement comprehensive Civil Service Commission regulations by creating new, constitutional damage remedy for employer's violation of employee's First Amendment rights).[24] Negotiated procedures for union representation of aggrieved employees are likely to be ignored, with the goal

---

23. *Monroe,* 540 A.2d at 739 (quoting *Jamison,* 281 U.S. at 640, 50 S.Ct. at 442).

24. The dissent argues that the "present case is the converse of *Bush." Post* at 640. Our colleague says that because the *Bush* Court refused to supplement comprehensive civil service regulations with a new constitutional remedy, absent legislative authorization, we should "eschew the destruction of common law rights by judicial *fiat." Post* at 640 (emphasis in original). We have noted there is a substantial likelihood, however, that immediately before the Council adopted CMPA, common law remedies had been

preempted by CSRA and thus were not available for defamation and emotional distress actions against a public employer. See *supra* note 17. Accordingly, just as the *Bush* Court was unwilling to find a new constitutional remedy to augment a comprehensive regulatory statute, we question whether the Council intended to resurrect common law remedies to supplement CMPA's comprehensive scheme. But even if common law remedies were available before CMPA, the policy reasons evident in *Bush* for precluding dual remedies are consistent with the Council's apparent reliance on the courts exclusively for reviewing administrative action.

of efficient, uniform resolution of grievances accordingly undermined. Ultimately, the public will pay the price as employee morale deteriorates from lax disciplinary enforcement and public services consequently suffer. As the United States Court of Appeals for the District of Columbia Circuit has recognized:

> The strong governmental interest in having a frank and honest assessment of ... employee work performance is absolutely essential to the proper rendering of ... services to our citizens. A supervisor's candid evaluation promotes efficient government by enabling an agency to identify and reward truly outstanding performance and to identify and correct, and on occasion to dispense with, performance that is unsatisfactory.

*Lawrence v. Acree,* 215 U.S.App.D.C. 16, 24, 665 F.2d 1319, 1327 (1981).

■ The remedies available under CMPA are substantial and may, in some respects, afford more complete relief than the damage remedies available at common law. For example, under CMPA, Thompson would have been able to seek reinstatement, and perhaps back pay.[25] Furthermore, the CMPA does not require an employee to overcome the qualified immunity of government officials as would be required in a common law damage action. *See Lucas,* 462 U.S. at 391, 103 S.Ct. at 2418 (Marshall, J., concurring); *Rustin v. District of Columbia,* 491 A.2d 496, 500 (D.C.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985). Moreover, CMPA procedures are speedier and less costly than litigation. In sum, the benefits of CMPA's administrative procedures coupled with judicial review are substantial when balanced against the costs, including delays, in obtaining damage remedies. We cannot say these advantages are clearly outweighed by the one obvious disadvantage of CMPA: the lack of a jury trial option. *See Lucas,* 462 U.S. at 391, 103 S.Ct. at 2418 (Marshall, J., concurring).

■ We do not believe the Council would characterize CMPA's comprehensive "performance ratings," "adverse actions," and employee "grievances" provisions as affording adequate remedies in only some, not all, instances where an employee claimed wrongful treatment cognizable under those provisions. Given the Council's clearly articulated policy goals of uniformity and efficiency, its carefully crafted provisions balancing employee rights to union representation and grievance processing with the needs of a merit personnel system, and the comprehensiveness of CMPA's remedies, we conclude that the Council intended CMPA to provide District employees with their exclusive remedies for claims arising out of employer conduct in handling personnel ratings, employee grievances, and adverse actions. Thompson's tort claims of defamation and intentional infliction of emotional distress, in contrast with her assault and battery claim, see *supra* note 2, arose out of disputes with her supervisor, appellant Maury, that clearly fall within the scope of CMPA §§ 1–615.1 to –615.5 and §§ 1–617.1 to –617.3. We hold, accordingly, that these provisions preclude litigation of Thompson's emotional distress and defamation claims, in the first instance, in Superior Court.

In so ruling, we express no opinion about how Thompson's claims under these particular CMPA provisions relate to the same claims filed under the CMPA disability compensation provisions, D.C.Code §§ 1–624.2 to –624.46.

### IV.

As indicated earlier, we reaffirm the introduction (except for the last two, dispositional sentences), Part I (facts and proceedings), Part II (CMPA disability provisions), and Part VII (reassignment to different trial judge) of our earlier opinion, *District of Columbia v. Thompson,* 570 A.2d 277 (D.C.1990).

---

**25.** CMPA defines OEA's power to grant relief very broadly. The Act permits OEA to "uphold, reverse or modify the decision of the agency" and to take "appropriate corrective actions" and "corrective or remedial action." D.C.Code §§ 1–606.3(b), –617.2, –617.3(b). Similarly, PERB is empowered to "reinstate, with or without back pay, or otherwise make whole, the employment or tenure of any employee...." D.C.Code § 1–618.13(a).

We vacate Part III (CMPA performance ratings, adverse actions, and grievance provisions), Part IV (intentional infliction of emotional distress),[26] Part V (defamation),[27] and Part VIII (summary of disposition), including footnote 23 concerning two additional, minor claims of error. We reaffirm Part VI (erroneous exclusion of evidence of Thompson's prior and post-termination threats and assaults against co-workers, and of Maury's peaceful character) in so far as it pertains to Thompson's assault and battery claim, but we vacate the last paragraph of Part VI, *id.* at 300, pertaining to the defamation claim.

Accordingly, as to the District of Columbia:

1. We reverse the judgments on Thompson's claims of intentional infliction of emotional distress, defamation, and assault and battery.

2. We remand for reassignment to a new trial judge and for entry of an order dismissing the emotional distress and defamation claims for lack of subject matter jurisdiction.

3. In ordering dismissal of Thompson's emotional distress and defamation claims, we do not address, let alone resolve, whether Thompson is, or is not, time barred from pursuing these claims administratively under either the CMPA disability provisions or the CMPA personnel evaluation provisions, or both. Nor do we express an opinion, as to Thompson's claims, on whether CMPA requires an election of CMPA remedies, or on how Thompson's claims should be characterized and articulated before a particular agency forum. We also express no opinion on the preclusive effect, if any, of Thompson's failure to raise an emotional distress or defamation claim or defense in the proceeding that terminated her employment (assuming for argument's sake that such a claim might have been germane to that proceeding).

4. We also remand for entry of an order to stay all further proceedings against the District until Thompson has had a reasonable time to file for disability benefits under CMPA for her claimed assault and battery. In doing so we assume (without deciding) that, under the circumstances Thompson is not time-barred from pursuing this claim administratively.

5. If Thompson does not file her assault and battery claim with DOES within a reasonable time, or if she does file and DOES concludes that the assault and battery claim falls within CMPA's disability provisions, the trial court shall dismiss that claim against the District. *But see Thompson,* 570 A.2d at 288 n. 6.

6. If DOES decides that the assault and battery claim against the District does not fall within CMPA's disability provisions, the trial court shall order a new trial on that claim.

Finally, as to Maury, we reverse for entry of an order dismissing the defamation and emotional distress claims. In addition, we reverse and remand Thompson's assault and battery claim against Maury for a new trial before a different judge.

*Reversed and remanded.*

SCHWELB, Associate Judge, dissenting:

Adopting the language of one of this nation's most eloquent jurists, the Supreme Court recently capsulized in two sentences the principles which, in my opinion, ought to dispose of this case:

> What the [District] asks is not a construction of a statute, but, in effect, an enlargement of it by the court, so that what was omitted, presumably by inadvertence, may be included within its scope. To supply omissions transcends the judicial function.

*West Virginia Univ. Hosps., Inc. v. Casey,* — U.S. ——, ——, 111 S.Ct. 1138, 1148,

---

**26.** Thompson, therefore, is free once again to pursue this claim administratively against Maury, as well as the District, subject to arguments (on which we express no opinion) that the claim is precluded by Thompson's failure to raise it in her termination proceeding, or by her pursuit of the claim out of time, or by the need to elect between CMPA's disability and personnel evaluation remedies.

**27.** See *supra* notes 3 and 26.

113 L.Ed.2d 68 (1991), (quoting *Iselin v. United States*, 270 U.S. 245, 250–51, 46 S.Ct. 248, 249–50, 70 L.Ed. 566 (1926) (per Brandeis, J.)). At the risk of precipitating a critic's resort to Emerson's old chestnut that a foolish consistency is the hobgoblin of little minds, I continue to think that we were right the first time. Accordingly, I respectfully dissent.

The problem presented by the District's petition for rehearing is not an easy one. I agree with my colleagues that it would have made sense as a matter of legislative policy to include in the CMPA a provision that the administrative remedies created by the statute for employees aggrieved by adverse actions, unfavorable performance ratings and the like shall be the exclusive means by which such persons may vindicate their rights. The Council of the District of Columbia could and perhaps should have so provided, but did not do so. Judges have no authority to correct perceived legislative errors and, if the legislation contains an inadvertent (or intentional) omission, then I think it is up to the Council and not to this court to provide a remedy.

I take it to be conceded for purposes of this appeal that but for the enactment of the CMPA, Ms. Thompson would be entitled to sue the District and Mr. Maury in the Superior Court for defamation and for intentional infliction of emotional distress.[1] If there were no CMPA, she would have the right to a determination by a jury of her peers of the issues of fact. If she prevailed,[2] she would be entitled to the various remedies available to other plaintiffs who have brought successful tort actions of this kind. The District apparently contends, and my colleagues now agree, that although such a right of action would

exist in the absence of the CMPA, it was destroyed as a result of the passage of that statute. I submit that there are profound difficulties with this position and that the disposition urged upon us by the District is legislative rather than judicial in character.

My colleagues concede that there is not a word either in the text of the CMPA or in its legislative history to the effect that the Act's remedies in relation to performance ratings, adverse actions and employee grievances are exclusive, or that common law judicial remedies are to be abolished.[3] The legislature's silence on this subject is in stark contrast to its enactment of an express exclusivity provision governing disability claims. D.C.Code § 1–624.16(c) (1987) provides:

> The liability of the District of Columbia government ... under this subchapter ... with respect to the injury or death of an employee, is exclusive and instead of all other liability of the District of Columbia government ... to the employee ... in a direct judicial proceeding, [or] in a civil action....

Obviously, as we noted in *Thompson I, supra*, 570 A.2d at 289, the Council knew how to make administrative remedies exclusive, and inserted a provision which unambiguously effected that result in one part of the CMPA but omitted it from another part.

"[E]ach part or section [of a statute] should be construed in connection with every other part or section so as to produce a harmonious whole." 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 46.05, at 90 (4th ed. 1984 & Cum.Supp.1990); *see Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C.1981). In determining the meaning of a statute, the court must not be

---

**1.** The District states in the introduction to its petition that

[f]or the reasons that follow, the [CMPA] should be interpreted as preempting common law actions based on activities that are properly classifiable as personnel actions.

No other contention is made, and my colleagues likewise rely entirely on the CMPA. Maj. op. at note 17; *cf. id.* at note 24. I therefore do not address in this dissenting opinion the question whether the right to sue the appellants in tort existed prior to the effective date of the CMPA.

**2.** I am not addressing here the merits of these claims. I adhere in this regard to our analysis in *Thompson I*, 570 A.2d at 289–98.

**3.** *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, —— U.S. ——, ——, 111 S.Ct. 1647, 1654, 114 L.Ed.2d 26 (1991) (where legislature intended to exclude or restrict a particular forum for resolving claims, "that intention will be deducible from text or legislative history.") (Citation omitted).

guided by a single sentence or part of a sentence, but must look to the provisions of the enactment as a whole. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956). "If ... comparison of one clause with the rest of the statute makes a certain proposition clear and undoubted, the act must be construed accordingly...." Sutherland, *supra*, § 46.05 at 90 (quoting *Attorney General v. Sillem*, 2 H & C 431, ——, 159 Eng.Rptr. 178, —— (1864)). More specifically,

> [w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.

*Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (citation omitted).

The quoted language from *Russello* fits this case like a glove.[4] Application of its principles to the CMPA militates against the notion that an exclusivity provision may be written into the portion of the statute dealing with grievances by judicial "construction" when a legislature which showed elsewhere in the same enactment that it knew exactly how to write such a provision elected *not to do so*.

Moreover, "[a] statute should not be construed in such a way as to render certain provisions superfluous or insignificant." *District of Columbia v. Acme Reporting Co.*, 530 A.2d 708, 713 (D.C.1987) (citation omitted); Sutherland, *supra*, § 46.06 at 104. If the comprehensive character of the CMPA were itself sufficient to render the remedies under the Act exclusive, then the specific exclusivity provision in the part of the statute dealing with disability claims would be superfluous.

The majority's interpretation of the CMPA also destroys common law rights, and "[t]he cardinal principle of statutory construction is to save and not to destroy." *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937). Just as repeals of statutes by implication are not favored, *Speyer v. Barry*, 588 A.2d 1147, at 1164–65 (D.C.1991), so "[n]o statute is to be construed as altering the common law, farther than its words import." *Shaw v. Railroad Co.*, 101 U.S. 557, 565, 25 L.Ed. 892 (1880); *Monroe v. Foreman*, 540 A.2d 736, 739 (D.C.1988). This rule is not an absolute one; it does not require "such an adherence to the letter as would defeat an *obvious* legislative purpose or lessen the scope *plainly* intended to be given to the measure." *Jamison v. Encarnacion*, 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082 (1930) (emphasis added); *see also Monroe, supra*, 540 A.2d at 739 (quoting *Jamison*). In my opinion, however, it cannot reasonably be contended that an *obvious* legislative purpose of the CMPA was to preempt common law tort remedies, or that the legislature *plainly* intended such a result. Indeed, our unanimous initial rejection of that notion seems

---

4. In spite of my colleagues' extensive discussion of the differing origins of the CMPA's disability and adverse action provisions, they cannot and do not deny that, in the language of *Russello*, the legislature "included particular language in one section of a statute but omit[ted] it in another section of the same act." *Id.* Surely common sense tells us that the writers or sponsors of the CMPA would probably read their handiwork and notice the stark contrast between the two parts of the enactment. I search the majority opinion in vain for a case that holds that two different sections *of the same statute* (even a big one) ought not to be compared with one another where this will help to ascertain legislative intent.

In *Holt v. United States*, 565 A.2d 970, 975 (D.C.1989) (en banc), on which my colleagues place their reliance for the proper occasion for construction *"in pari materia,"* we observed that the explicit inclusion of the element of intent to extort in the extortion prohibition with which it was enacted *suggests that the legislature knew how to specify such intent if it wished.*

(Emphasis added). I suggest that this absolutely unassailable proposition, contained in an opinion which Judge Belson wrote and which Judge Ferren and I joined, has considerable relevance to the present case. If my colleagues will substitute "exclusivity provision" for "intent to extort" (and change a couple of other contextual words), this well-considered passage from *Holt* will lead them directly to what I view as the correct resolution of the present appeal.

to me to demonstrate that its rectitude is less than plain or obvious.[5]

The District relies on two separate lines of authority in support of its interpretation of the CMPA, but neither sustains its position. First, it cites cases like *David v. United States*, 820 F.2d 1038, 1043 (9th Cir.1987), in which a federal employee's action against her supervisors for intentional infliction of emotional distress was held to be "a common-law cause of action which is preempted by the CSRA" (the federal Civil Service Reform Act). The court did not discuss the reasons for its holding, but cited its previous decision in *Lehman v. Morrissey*, 779 F.2d 526 (9th Cir.1985) (per curiam). In *Lehman*, the court explicitly stated that the result it reached on analogous facts was based exclusively on federal preemption doctrine. *Id.* at 526–27 n. 1. In *Broughton v. Courtney*, 861 F.2d 639 (11th Cir.1988), also cited by the District, the court likewise unambiguously predicated a similar decision on identical principles.[6] As we correctly pointed out in our original opinion in *Thompson I*, 570 A.2d at 289 & n. 9, this doctrine is not applicable in the present case. It is one thing to infer that Congress did not intend to countenance state law remedies when it enacted preemptive legislation governing the rights of federal employees, and quite another to ascribe to the District's legislature an intention to destroy common law rights in the absence of any conflict or collision with federal statutory policy.

The District also relies on *Bush v. Lucas*, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), and on other decisions which follow that case.[7] In *Bush*, an employee of the National Aeronautics and Space Administration who claimed to have been demoted in retaliation for public criticism of his agency asked the Supreme Court "to authorize a new nonstatutory damages remedy for federal employees whose First Amendment rights are violated by their superiors." *Id.* at 368, 103 S.Ct. at 2406. The Supreme Court unanimously rejected that invitation to judicial activism:

> Because such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States, we conclude that it would be inappropriate for us to supplement that regulatory scheme *with a new judicial remedy.*

*Id.* (emphasis added). Observing that Congress could have created such a remedy but did not do so, the Court declined to "create *a new substantive legal liability* without legislative aid and as at the common law." *Id.* at 390, 103 S.Ct. at 2418 (emphasis added) (quoting *United States v. Standard Oil Co.*, 332 U.S. 301, 302, 67 S.Ct. 1604, 1605, 91 L.Ed. 2067 (1947)). The Court recognized that

> [t]he selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them.

*Id.* 462 U.S. at 380, 103 S.Ct. at 2412 (quoting *United States v. Gilman*, 347 U.S. 507, 511–13, 74 S.Ct. 695, 697–98, 98 L.Ed. 898 (1954)).[8]

---

**5.** I agree with the majority that the CMPA "plainly" provides for a comprehensive system of administrative review of employer actions, as well as for judicial review. What it does not provide, plainly, obscurely, or at all, is that the aggrieved employee cannot go to court instead. If that is what the drafters intended, then we are confronted, in Churchill's phrase, with a "riddle wrapped in a mystery inside an enigma" as to why they did not say so.

**6.** "[T]he fact that giving preemptive effect to a federal statute would leave an individual without a remedy does not mean that Congress did not intend to preempt state law." *Broughton,*

*supra,* 861 F.2d at 643 (citing *Howard v. Parisian, Inc.,* 807 F.2d 1560, 1565 (11th Cir.1987)).

**7.** *See, e.g., Karahalios v. National Fed'n of Fed. Employees, Local 1263,* 489 U.S. 527, 536, 109 S.Ct. 1282, 1288, 103 L.Ed.2d 539 (1989); *Spagnola v. Mathis,* 273 U.S.App.D.C. 247, 253 n. 10, 859 F.2d 223, 229 n. 10 (1988) (per curiam) (en banc).

**8.** The majority also relies on *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), in which a sharply divided Supreme Court held that the CSRA precludes review of certain adverse personnel actions under the Back Pay Act. The Court explained that its

The present case is the converse of *Bush*. Here, the court is not being asked to create a new non-statutory remedy which the legislature has failed to provide. Rather, the District is demanding that we do for it what the Council has failed to do, namely, to abolish a common law right of action. The same canons of judicial self-restraint which persuaded the Court not to conjure up a new right and judicial remedy in *Bush* should lead us to eschew the destruction of common law rights by judicial *fiat*. Construction is not legislation and must avoid "that retrospective expansion of meaning which properly deserves the stigma of judicial legislation." *Kirschbaum Co. v. Walling*, 316 U.S. 517, 522, 62 S.Ct. 1116, 1119, 86 L.Ed. 1638 (1942).

The District argues that the costs associated with the continued availability of common law remedies are substantial and would undermine CMPA's merit personnel system. The majority disagrees with the District, but discerns a somewhat different problem:

> we do agree that the burdens of an employer's having to anticipate and deal with two, often substantially different remedial systems (one of them protracted litigation) available at the election of each employee are likely to have a chilling effect on mandated and bargained personnel procedures—an effect that could debilitate the very foundation of the merit personnel system.

Maj. op at 634. In other words, the District and my colleagues think the statute has not worked well or will not work well unless we write into it what the Council

left out. As Justice Frankfurter explained for the Court in *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944), however,

> it is no warrant for extending a statute that experience may disclose that it should have been made more comprehensive. The natural meaning of words cannot be displaced by reference to difficulties in administration.

(Citation and internal quotation marks omitted).

The majority has effectively marshalled the arguments against the co-existence of judicial and administrative remedies in this sensitive field. I respect the view that ambiguities in legislation should, if possible, be resolved in a manner which will avoid unreasonable or inequitable results. I do not think, however, that invocation of such a principle will support our reading into the CMPA something that the Council could have written but did not write. The District's policy arguments may well be persuasive, but they are directed to the wrong forum. They call for a legislative remedy, not a judicial one. I therefore adhere to our initial resolution of this appeal.

---

decision was not at odds with the presumption against implicit repeals of legislation, for the Back Pay Act was being left intact and the Court was overruling only "a legal disposition implied by [the] statutory text." *Id.* at 453, 108 S.Ct. at 676. In the present case, the construction urged upon us by the District abrogates altogether the common law rights and remedies of District employees to sue in tort in situations of this kind.

My colleagues also say that it is "interesting to note" that in *Fausto*, "no one sought to argue against such preclusion by citing the absence of an exclusivity provision, in contrast with the presence of an exclusivity provision in FECA...." Maj. op. at note 20. However inter-

esting this may be, it has absolutely no precedential significance. As the Supreme Court explained in *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925),

> [t]he most that can be said is that the point was in the cases if anyone had seen fit to raise it. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

In fact, Judge Ferren was a member of the unanimous division which quoted most of this language with approval, and followed its dictates, in *Thompson v. United States*, 546 A.2d 414, 423 n. 14 (D.C.1988).